Kevin PEACE, a Minor, By His Guardian Ad Litem, Robert J. Lerner, Plaintiff-Joint-Appellant,

v.

NORTHWESTERN NATIONAL INSURANCE COMPANY, Defendant-Respondent-Petitioner

DJUKIC ENTERPRISES, INC., Defendant-Joint-Appellant,

STATE FARM GENERAL INSURANCE COMPANY, Darrell Harding, Edmund J. Durand and Wisconsin Department of Health and Social Services, Defendants.

Supreme Court

*No. 96–0328. Oral argument September 9, 1998.—Decided July 9, 1999.*

(Also reported in 596 N.W.2d 429.)

For the defendant-respondent-petitioner there were briefs by *John R. Pendergast, Jr.,* and *Crivello, Carlson, Mentkowski & Steeves, S.C.,* Milwaukee and oral argument by *John R. Pendergast, Jr.*

For the plaintiff-joint appellant there was a brief by *Robert J. Lerner, B. Michele Sumara* and *Perry, Lerner, Quindel & Saks, S.C.,* Milwaukee and oral argument by *B. Michele Sumara.*

For the defendant-joint appellant there was a brief by *James E. Culhane* and *Davis & Kuelthau, S.C.,* Milwaukee and oral argument by *James E. Culhane.*

Amicus curiae was filed by *Susan R. Tyndall* and *Hinshaw & Culbertson,* Milwaukee for the Wisconsin Insurance Alliance and Civil Trial Counsel of Wisconsin.

Amicus curiae was filed by *Robert C. Burrell, R. Jeffrey Wagner* and *Borgelt, Powell, Peterson & Frauen, S.C.,* Milwaukee, of counsel, *Laura A. Foggan, Daniel E. Troy, Howard M. Radzely* and *Wiley, Rein & Fielding,* Washington, D.C., for the Insurance Environmental Litigation Association.

Amicus curiae was filed by *Peter G. Earle* and *Boyton & Earle,* Milwaukee, *Irene C. Warshauer* and *Anderson, Kill & Olick, P.C.,* New York, NY, of counsel, *Amy Bach,* counsel for Untied Policyholders, San Francisco, CA, for the United Policyholders.

Amicus curiae was filed by *Raymond R. Krueger, David V. Meany* and *Michael, Best & Friedrich, LLP,* Milwaukee, of counsel, *Howard S. Lindenberg,* senior counsel for Federal Home Loan Mortgage Corporation,

McLean, VA, for Federal Home Loan Mortgage Corporation and Fair Lending Coalition.

¶ 1. DAVID T. PROSSER, J. Northwestern National Insurance Company (Northwestern) seeks review of a court of appeals' decision which reversed a circuit court grant of summary judgment to Northwestern.[1] Northwestern asserts that the insurance policy it sold to Djukic Enterprises (Djukic) excludes coverage for personal injury claims arising from the ingestion of lead in flaked or chipped paint or dust present in an apartment Djukic rented to the minor plaintiff, Kevin Peace, and his mother. The circuit court concluded that lead present in paint is a pollutant under the terms of Northwestern's pollution exclusion clause, and that when lead-based paint has chipped, flaked, or deteriorated into dust, that action is a discharge, dispersal, release, or escape under the policy's exclusion. The court of appeals ultimately reversed, concluding that lead derived from paint chips, paint flakes and dust is not a pollutant or contaminant under the exclusion.

¶ 2. Based on the terms of the insurance policy at issue and the reasonable expectations of an insured property owner in 1988, we conclude that lead present in paint in a residence is a pollutant. We also conclude that when lead-based paint either chips, flakes, or deteriorates into dust or fumes, that action is a discharge, dispersal, release, or escape within the meaning of terms in the insurance policy. We therefore reverse the court of appeals and hold that the pollution exclusion clause in this case bars the property owner's claim against its insurer for defense against a suit for

---

[1] *Peace v. Northwestern National Ins. Co.*, 215 Wis. 2d 165, 573 N.W.2d 197 (Ct. App. 1997).

bodily injuries arising from lead-based paint that chips, flakes, or deteriorates to dust on his property.

## FACTS

¶ 3. The complaint reveals the following: Between the period of August 1987 and March 1989, Djukic, and at some point Darrell Harding and Edmund J. Durand, owned an apartment building on North 15th Street in Milwaukee. Kevin Peace, a minor, lived with his mother in an apartment in that building during the relevant time period.

¶ 4. On November 3, 1988, a City of Milwaukee Health Department inspector visited the North 15th Street premises. That inspection, while not identifying a particular apartment at the premises, revealed the presence of loose, peeling, flaking, or chipped paint which contained a hazardous concentration of lead. In a November 7 notice of ordinance violation addressed to Djukic, the city sanitarian advised Djukic that such conditions tend to cause lead poisoning.[2] The sanitarian ordered Djukic to take immediate corrective action to protect the public health and permanently correct the hazardous conditions within 30 days.

¶ 5. Approximately six weeks after the notice of ordinance violation was issued, Djukic obtained commercial general liability coverage for the 15th Street property through Northwestern. The policy was in

---

[2] Lead poisoning can cause brain damage, developmental disorders, kidney and liver disease; it contaminates the body by injecting impurities into the blood stream. *Lefrak Organization, Inc. v. Chubb Custom Ins. Co.*, 942 F. Supp. 949, 955 (S.D.N.Y. 1996). "Children under the age of six, whose nervous systems are still developing, are particularly vulnerable to the damage caused by lead poisoning." *Juarez v. Wavecrest Management Team Ltd.*, 672 N.E.2d 135, 139 (N.Y. 1996).

effect from December 15, 1988, through March 10, 1989.[3]

¶ 6. The policy provided coverage for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."

¶ 7. The policy also excluded certain coverage. The pollution exclusion clause excluded " 'bodily injury' or 'property damage' arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants: (a) At or from premises you own, rent or occupy. . . ." The policy defined "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."[4]

---

[3] On February 6, 1989, Northwestern mailed a cancellation notice of the policy to Djukic, effective March 10, 1989, for underwriting reasons.

[4] The full text of the pertinent exclusion reads:

**2. Exclusions.**
 This insurance does not apply to:

. . .

f. (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:

(a) At or from premises you own, rent or occupy;

(b) At or from any site or location used by or for you or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for you or any person or organization for whom you may be legally responsible; or

(d) At or from any site or location on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations:

 (i) if the pollutants are brought on or to the site or location in connection with such operations; or

## PROCEDURAL HISTORY

¶ 8. On May 10, 1995, the guardian ad litem for Peace filed a complaint asserting that Djukic, Harding, and Durand negligently failed to comply with a City of Milwaukee ordinance prohibiting any lead-based nuisance from existing on the property,[5] negligently failed

---

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

(2) Any loss, cost, or expense arising out of any governmental direction or request that you test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

[5] The 1988 City of Milwaukee Ordinances provided in part:

Chapter 66 TOXIC AND HAZARDOUS SUBSTANCES
66–20. Definitions. In this chapter:

. . .
6. ELEVATED BLOOD LEVEL is defined as a confirmed concentration of lead in whole blood of 25 micrograms per deciliter or greater, or the current level set by the U.S. Public Health Service, whichever is more restrictive.
7. LEAD BASED OBJECT means any surface or substance covered with a lead-based coating.
8. LEAD BASED SUBSTANCE means any substance whether gas, liquid, solid or any combination of the above that contains lead in excess of a level established by the commissioner.
9. LEAD BASED SURFACE means any painted or coated surface, having a lead content greater than or equal to one milligram of lead per square centimeter in the dry surface as measured by an x-ray fluorescence analyzer or other approved recognized field or laboratory method.
10. LEAD TOXICITY means an elevated blood lead level with an erythrocyte protoporphyrin level in whole blood of 35 micrograms per deciliter or greater, or the current level set by the U.S. Public Health Service, whichever is more restrictive.

. . .
66–22. Lead Poisoning Prevention and Control Regulations.

113

to inspect and maintain the apartment, and negligently failed to properly remove all lead-based paint from the property. The plaintiff also asserted that Djukic, Harding, and Durand rented the property in violation of Wis. Admin. Code § Ag 134.04(2)(b)4,[6] because the property, by virtue of its deteriorated and poorly maintained surfaces which had been painted with lead-based paint, posed an unreasonable risk of personal injury.

---

1. NUISANCE. Any lead based substance, surface or object which may contribute to an increased body burden of lead due to its condition, location or nature, or which is easily accessible to children, is declared a public health hazard and nuisance as defined in s. 80–1–2.

2. PROHIBITED ACTS. a. No owner may create or allow to exist in or on their property any lead based substance, surface or object which is accessible to children, or may become accessible to children.

[6] Wisconsin Admin. Code § Ag 134.04 (1988) stated, in part:

**Ag 134.04 Disclosure requirements.**

. . .

**(2)** CODE VIOLATIONS AND CONDITIONS AFFECTING HABITABILITY. Before entering into a rental agreement or accepting any earnest money or security deposit from the prospective tenant, the landlord shall disclose to the prospective tenant:

. . .

(b) The following conditions affecting habitability, the existence of which the landlord knows or could know on basis of reasonable inspection, whether or not notice has been received from code enforcement authorities:

. . .

4. Any structural or other conditions in the dwelling unit or premises which constitute a substantial hazard to the health or safety of the tenant, or create an unreasonable risk of personal injury as a result of any reasonably foreseeable use of the premises other than negligent use or abuse of the premises by the tenant.

¶ 9. In addition, the complaint alleged that Djukic, Harding, and Durand violated Wis. Stat. § 100.20(5) (1987–88)[7] by failing to disclose to Kevin Peace or his mother the existence of such hazardous conditions. Lastly, the complaint asserted that Djukic, Harding, and Durand breached an implied warranty of habitability. The complaint alleged that defendants' actions caused Kevin Peace personal injury and substantial medical expense. Specifically, Peace's complaint alleged that he "sustained lead poisoning by ingesting lead derived from paint chips, paint flakes and dust that was contaminated with lead derived from lead based paint" at the apartment he shared with his mother.

¶ 10. After Peace filed his complaint, Djukic tendered defense of the lawsuit to Northwestern. Northwestern asserted that it had no coverage for the loss, and thus had no duty to defend Djukic. Northwestern sought a summary judgment to confirm that it had no duty to defend.[8] Northwestern based its denial

---

[7] Wisconsin Stat. § 100.20(5) (1987–88) provided:

**100.20 Methods of competition and trade practices**

(5) Any person suffering pecuniary loss because of a violation by any other person of any order issued under this section may sue for damages therefor in any court of competent jurisdiction and shall recover twice the amount of such pecuniary loss, together with costs, including reasonable attorney's fee.

[8] On October 13, 1995, the parties stipulated to a stay of discovery on the underlying tort claim until resolution of the summary judgment motion filed by Northwestern. Northwestern sought summary judgment on two grounds: its pollution exclusion, and its expected or intended exclusion. The latter exclusion excludes from coverage bodily injury or property damage expected or intended from the standpoint of the insured. The scope of the expected or intended exclusion, as one of North-

115

of coverage and motion for summary judgment on the terms of the pollution exclusion clause in its policy.

¶ 11. Djukic and its other liability insurer, State Farm General Ins. Co., filed a cross motion for summary judgment. Relying on cases from other jurisdictions, Djukic argued that lead paint is not a pollutant because lead was not an unwanted additive in the paint. Instead, Djukic pointed out that lead was intentionally added to paint. Djukic also argued that there was no "release" of a pollutant. To fit the policy's definition of discharge, dispersal, release, or escape, Djukic asserted, the pollutant had to move to an unintended location but such movement did not occur in this case.

¶ 12. Peace argued that pollution exclusion clauses are intended to apply only to environmental pollution. He also argued that the act of ingesting lead paint does not fit the exclusion's requirement that the pollutant "discharge, disperse, release or escape," nor does lead paint fit the definition of "pollutant" contained in the policy.

¶ 13. At a hearing on November 27, 1995, the circuit court for Milwaukee County, Michael J. Barron, Judge, rendered an oral decision concluding that Northwestern had no duty to defend Djukic based on the policy's pollution exclusion clause. The circuit court relied on *United States Fire Ins. Co. v. Ace Baking Co.*, 164 Wis. 2d 499, 476 N.W.2d 280 (Ct. App. 1991), and its discussion of when a substance is considered a pollutant under the pollution exclusion clause. The circuit court recognized that lead has a very toxic effect on children. In addition, the circuit court concluded that the lead on Djukic's property was not confined to the

western's asserted bases for summary judgment, is not before us on this review.

area of intended use on the walls, but instead had dispersed.

¶ 14. In a *per curiam* decision,[9] the court of appeals affirmed the circuit court's entry of summary judgment, based in part on *Vance v. Sukup*, 207 Wis. 2d 578, 558 N.W.2d 683 (Ct. App. 1996), *vacated*, 211 Wis. 2d 529, 568 N.W.2d 297 (1997). The court of appeals concluded that lead was a contaminant under the pollution exclusion clause once the lead "escaped from the painted surfaces either by leaving the paint or because the paint itself chipped off." *Peace v. Northwestern Nat'l Ins. Co.*, No. 96–0328, unpublished slip op. at 5 (Wis. Ct. App. Feb. 4, 1997) (quoting *Vance*, 207 Wis. 2d at 584). The per curiam decision also relied on *Vance* to reject Peace's argument that pollution exclusion clauses apply only to environmental pollution and not to residential lead poisoning cases. *See Peace*, slip op. at 5.

¶ 15. Djukic and Peace jointly sought review of the per curiam decision. This court held in abeyance that petition for review pending our review of the court of appeals decision in *Donaldson v. Urban Land Interests, Inc.*, 205 Wis. 2d 408, 556 N.W.2d 100 (Ct. App. 1996). Following the release of *Donaldson v. Urban Land Interests*, 211 Wis. 2d 224, 564 N.W.2d 728 (1997), we summarily vacated the per curiam decision in *Peace* as well as the court of appeals published decision in *Vance*, and remanded to the court of appeals for reconsideration in light of *Donaldson. See* Table, 211 Wis. 2d at 529.

¶ 16. On November 18, 1997, after receiving supplemental briefs, a divided court of appeals reversed the circuit court's entry of summary judgment. *Peace v.*

---

[9] *Peace v. Northwestern Nat'l Ins. Co.*, No. 96–0328, unpublished slip op. (Wis. Ct. App. Feb. 4, 1997).

*Northwestern Nat'l Ins. Co.*, 215 Wis. 2d 165, 167, 573 N.W.2d 197 (Ct. App. 1997). The majority concluded that the distinction between lead from "intact accessible painted surfaces" and lead from "paint chips, paint flakes and dust" was immaterial to a determination of coverage under a pollution exclusion clause. *Id.* at 171. The majority read *Donaldson* to reject implicitly the premise of *Vance* and *Ace Baking* that lead becomes a contaminant only after it escapes from the painted surfaces. *Id.* at 172–73. Instead, the court of appeals majority relied on *Donaldson*'s citation to a federal court's characterization of certain events as outside the scope of the pollution exclusion clause. *Id.* at 173 (citing *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1044 (7th Cir. 1992)). The *Pipefitters* court had characterized paint peeling off a wall, asbestos particles escaping during insulation work, and spray paint drifting off the mark as "everyday activities gone slightly, but not surprisingly, awry."

¶ 17. Relying on the illustrations in *Pipefitters*, the court of appeals first concluded that when a child ingests lead from paint present on a painted surface or in paint chips, flakes, or dust, his or her injury arises from an activity gone slightly, but not surprisingly, awry. *Peace*, 215 Wis. 2d at 174. Next, the court of appeals used the vacated opinion in *Vance* to conclude that lead is not a contaminant in paint to which it was deliberately added. *Id.* at 174. For those reasons, the court of appeals reversed the judgment of the circuit court and held that Northwestern's pollution exclusion clause does not preclude coverage and that Northwestern had a duty under the policy to defend Djukic. *Id.* at 175.

¶ 18. On March 17, 1998, we granted Northwestern's petition for review to clarify our approach to the interpretation of the pollution exclusion clause.

¶ 19. The question before us is whether the circuit court properly granted summary judgment to Northwestern by concluding that the policy Djukic purchased did not provide coverage for bodily injury claims arising from ingestion of lead derived from lead-based paint that has chipped, flaked, or deteriorated into dust within a residence. To answer this question, we first consider whether lead present in paint is a pollutant under the plain meaning of Northwestern's pollution exclusion clause. If it is, we then consider whether, when lead-based paint chips, flakes, or deteriorates into dust or fumes, that action constitutes a discharge, dispersal, release, or escape under the policy. Both inquiries must be answered in the affirmative for the pollution exclusion clause to preclude coverage, and for us to affirm the circuit court's grant of summary judgment. *See Donaldson*, 211 Wis. 2d at 229.

## STANDARDS OF REVIEW

¶ 20. We review summary judgment rulings independently, *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987), using the same methodology as that used by the circuit court. *Grams v. Boss*, 97 Wis. 2d 332, 338–39, 294 N.W.2d 473 (1980). A motion for summary judgment must be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, establish that there is no genuine issue of material fact, and the moving party is entitled

to judgment as a matter of law.[10] Wis. Stat. § 802.08(2) (1995–96). Here, the parties all assert that there is no material fact in dispute with regard to the pollution exclusion claim. We agree that there is no genuine issue of material fact and that the question presented is purely a question of law.

■

¶ 21. Northwestern moved for summary judgment based on the terms of the insurance policy Djukic purchased. Interpretation of an insurance policy is a question of law we review independently, without deference to the decisions of the circuit court and the court of appeals. *Kaun v. Industrial Fire & Cas. Ins. Co.*, 148 Wis. 2d 662, 667, 436 N.W.2d 321 (1989).

## ANALYSIS

¶ 22. This case requires that we interpret the pollution exclusion clause as it applies to lead-based paint. We must determine whether lead present in paint that chips, flakes, or deteriorates to dust or fumes is a "pollutant" that discharged, dispersed, released, or escaped within the meaning of terms in the pollution exclusion clause of the insurance policy.

■

¶ 23. Interpretation of insurance contract language is governed by the same rules of interpretation and construction that govern other contracts. *Weimer v. Country Mut. Ins. Co.*, 216 Wis. 2d 705, 721, 575 N.W.2d 466 (1998); *Smith v. Atlantic Mut. Ins. Co.*, 155 Wis. 2d 808, 810, 456 N.W.2d 597 (1990). The primary object in contract interpretation is to ascertain and

---

[10] There are no depositions, answers to interrogatories or admissions in the record before us. Thus, in this case, we review only the pleadings and affidavits to determine whether there is a genuine issue of material fact.

carry out the intent of the parties. *General Cas. Co. of Wisconsin v. Hills*, 209 Wis. 2d 167, 175, 561 N.W.2d 718 (1997); *Kremers-Urban Co. v. American Employers Ins. Co.*, 119 Wis. 2d 722, 735, 351 N.W.2d 156, 163 (1984). Policy language is interpreted according to its plain and ordinary meaning as understood by a reasonable insured. *Kremers-Urban*, 119 Wis. 2d at 735.

¶ 24. Terms or phrases in an insurance contract are not plain but ambiguous if "they are fairly susceptible to more than one construction." *Id.* at 735. An ambiguity has been described as "an intrinsically imprecise or uncertain" term; an ambiguity may also arise "because external factors have rendered the language chosen inadequate to resolve the problem at hand." James M. Fischer, *Why are Insurance Contracts Subject to Special Rules of Interpretation?: Text Versus Context*, 24 ARIZ. ST. L.J. 995, 998 (Fall, 1992). If coverage is ambiguous, an exclusion will be narrowly construed against the insurer. *Smith*, 155 Wis. 2d at 811. However, this principle does not allow a court to eviscerate an exclusion that is clear from the face of the insurance policy. *Whirlpool Corp. v. Ziebert*, 197 Wis. 2d 144, 152, 539 N.W.2d 883 (1995). *See also Donaldson*, 211 Wis. 2d at 231 ("absent a finding of ambiguity, this court will not use the rules of construction to rewrite the language of an insurance contract").

I.

¶ 25. With these rules of interpretation in mind, we examine the question whether lead present in paint is plainly within the policy's definition of "pollutants."

¶ 26. The term "pollutants" is defined in the policy. "Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke,

vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

¶ 27. Under the policy, a pollutant includes the following: (1) any solid irritant; (2) any liquid irritant; (3) any gaseous irritant; (4) any thermal irritant; (5) any solid contaminant; (6) any liquid contaminant; (7) any gaseous contaminant; and (8) any thermal contaminant.

¶ 28. A number of words within the definition of "pollutants" are not defined in the policy. When determining the ordinary meaning of these words, it is appropriate to look to the definitions in a non-legal dictionary. *Weimer*, 216 Wis. 2d at 723; *Just v. Land Reclamation*, 155 Wis. 2d 737, 456 N.W.2d 570 (1990).

¶ 29. A "contaminant" is defined as one that contaminates. *American Heritage Dictionary of the English Language* 406 (3d ed. 1992). "Contaminate" is defined as "1. To make impure or unclean by contact or mixture." *Id.* at 406.

¶ 30. An "irritant" is defined as the source of irritation, especially physical irritation. *Id.* at 954. "Irritation" is defined, in the sense of pathology, as "A condition of inflammation, soreness, or irritability of a bodily organ or part." *Id.* at 954.

¶ 31. "Chemical," one of the examples of contaminants or irritants included in the policy's definition of "pollutants," is defined as "A substance with a distinct molecular composition that is produced by or used in a chemical process." *Id.* at 327. The dictionary also defines "chemistry" as "The science of the composition, structure, properties, and reactions of matter, especially of atomic and molecular systems. 2. The

composition, structure, properties, and reactions of a substance." *Id.* at 328.

¶ 32. "Lead" is also defined in the dictionary. Lead is a "soft, malleable, ductile, bluish-white dense metallic element, extracted chiefly from galena and used in containers and pipes for corrosives, solder and type metal, bullets, radiation shielding, paints, and antiknock compounds." *Id.* at 1023.

¶ 33. "Lead" is a chemical element with particular properties. It may be "used in a chemical process." It clearly fits within the definition of "chemical."

¶ 34. "Lead paint," which is composed of lead and other chemicals, starts out as a liquid and becomes a solid after it is applied and dries. Over time, lead paint may chip and flake becoming solid "waste." When it begins to deteriorate, it may give off "fumes." When it begins to disintegrate, it becomes dust—fine, dry particles of matter[11] which, like smoke and soot, can float in the air affecting human respiration until it eventually settles on the ground.

¶ 35. Lead poisoning from paint at residential properties is generally caused by the inhalation of lead-contaminated dust particles or toxic lead fumes through respiration or the ingestion of lead-based paint chips by mouth.[12] The consequences can be disastrous for children:

---

[11] Dust is defined as "1. Fine, dry particles of matter. 2. A cloud of fine, dry particles. 3. Particles of matter regarded as the result of disintegration." *The American Heritage Dictionary of the English Language* (3rd edition), p. 572.

[12] Lin-Fu, J., *Vulnerability of Children to Lead Exposure and Toxicity*, 289 N. ENG. J. MED. 1229, 1231 (1973).

*Statement on Childhood Lead Poisoning*, 79 Pediatrics 457, 459 (March 1987):

At high blood levels. . .lead may cause encephalopathy and death. Survivors of encephalopathy may have lifelong severe disabilities, such as seizures and mental retardation. Lead toxicity affects almost every organ system, most importantly, the central and peripheral nervous systems, kidneys, and blood. . . .Lead interferes with enzymes that catalyze the formation of heme. It also inhibits both prenatal and postnatal growth. Lead impairs hearing acuity. Lead is a carcinogen in laboratory animals, and there is some evidence for carcinogenicity in workers exposed to lead but not in children.

Although the impairment of cognition in young children. . .has been reported, no threshold has been identified. . . .The relationship between lead levels and IQ deficits was found to be remarkably consistent. A number of studies have found that for every 10 mug/dL increase in blood lead levels, there was a lowering of mean IQ in children by four to seven points. (Sources omitted.)

*Lead Poisoning: From Screening to Primary Prevention*, 92 Pediatrics 176, 177 (July 1993).

¶ 36. There is also concern about lead poisoning in the workplace. Lead poisoning may result in complaints of weakness, weight loss, lassitude, insomnia,

A previously unforeseen, but increasingly recognized danger is that of improper removal of lead-based paint from older houses during renovation or, ironically, during cleaning to protect children. Torches, heat guns, and sanding machines are particularly dangerous because they can create a lead fume. Sanding not only distributes lead as a fine dust throughout the house but also creates small particles that are more readily absorbed than paint chips. . . .Proper cleaning of the dust and chips produced in deleading must include complete removal of all chipping and peeling paint and vacuuming and thorough wet mopping, preferably with high-phosphate detergents. *This waste must be discarded in a secure site.* (Emphasis supplied.)

and hypotension. It may also disturb the gastrointestinal tract, including constipation, anorexia, and cause abdominal discomfort or actual colic which may be excruciating. Anemia is frequently associated with lead poisoning. The patient's gums may reveal a blue or blue-black line in the presence of poor dental hygiene. *See* Nick H. Proctor, et al., *Chemical Hazards of the Workplace* 294 (2d ed. J.B. Lippincott Company 1988).[13]

¶ 37. Lead is a solid contaminant. Lead paint either is or threatens to be a solid or liquid contaminant. Lead paint chips are a solid contaminant. Lead paint fumes are a gaseous irritant or contaminant. Lead paint dust is a solid (although sometimes an airborne) irritant or contaminant. There is little doubt that lead derived from lead paint chips, flakes, or dust is an irritant or serious contaminant.[14]

---

[13] In the early 1980s, Wisconsin passed a "Right to Know" law giving employees the right to request information from an employer about potentially dangerous, health-affecting substances used in the workplace. Chapter 364, Laws of 1981. The law was similar to the older federal Occupational Safety and Health Act regulations. The Wisconsin legislature cited 29 C.F.R. Part 10, subpart Z in which there were numerous references to lead.

[14] "Lead is an extremely toxic metal: even a single atom of lead, once in the human body, binds to a protein and induces some damage; the greater the exposure, the more serious the effects. Lead has no physiological function; any amount of body lead reflects environmental pollution." Piomelli, S. *Childhood Lead Poisoning in the '90s*, 93 Pediatrics 508 (March 1994). "Lead is one of the most widespread environmental toxins facing American children." Shannon, M. *Lead Intoxication in Infancy*, 89 Pediatrics 87 (January 1992). "Lead paint is a known carcinogen and highly dangerous environmental toxin."

¶ 38. The plaintiff's complaint alleges that "between August 1987 and March 1989, the plaintiff sustained lead poisoning by ingesting lead derived from paint chips, paint flakes and dust that was *contaminated* with lead derived from lead based paint at the premises located at 1102 North 15th Street, Milwaukee, Wisconsin." (Emphasis added.) Peace's complaint suggests that the paint was contaminated by the lead. Conceptually, we view the lead not as contaminating the paint but as giving the paint the potential to contaminate air, water, and the human body when it disperses. Lead-based paint is an inchoate contaminant before it breaks down (unless it is directly discharged, say, into water); it becomes both an irritant and a contaminant after it breaks down into chips, flakes, dust, or fumes.

## II.

¶ 39. The second issue is whether Peace's injuries arose out of the "discharge, dispersal, release or escape of pollutants. . . ."

¶ 40. The words "discharge," "dispersal," "release," and "escape" are not defined in the policy, but they appear to describe the entire range of actions by which something moves from a contained condition to an uncontained condition. "Release" is a transitive verb. "Discharge," "disperse," and "escape" are verbs that can be either transitive or intransitive. This implies that the movement from a contained condition to an uncontained condition can be either intentional and purposeful or accidental and involuntary. In its transitive form, the verb "discharge" is defined: "To

Coyne, *Lead Paint Abatement: Who Should Pay?* 2 WIS. ENVTL. L.J. 113, 114 (Winter 1995).

release, as from confinement. . . ." In its intransitive form, the verb "discharge" is defined, in part, as "To pour forth, emit, or release contents." *The American Heritage Dictionary of the English Language* (3rd edition), p. 530. "Escape" is defined, in part, as "1. To break loose from confinement. . . .2. To issue from confinement or an enclosure; leak or seep out. . . ." *Id.* at 625.

¶ 41. In *Employers Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 52 Cal. Rptr. 2d 17, 23 (Cal. App. 2 Dist. 1996), the California Court of Appeals stated:

> Words in an insurance policy are to be given their ordinary and popular meanings. Therefore, we look to the ordinary meanings of discharge, dispersal, release and escape. Discharge is a release, emission or issuance. (Webster's New Collegiate Dict. (9th ed. 1984) p. 360). Dispersal is a scattering, spreading or distribution. (*Id.* at p. 365). Release is a liberation, freeing, or permitting to escape. (*Id.* at p. 994). Escape is a leaking or overflow. (*Id.* at p. 424). These terms taken together constitute a comprehensive description of the processes by which pollutants may cause injury to persons or property.

¶ 42. We believe the plain language of the policy covers the release of paint containing lead from a wall or ceiling into the air or onto the floor.[15] "Common

---

[15] A major environmental problem can be created by uninformed or careless efforts to remove lead paint from painted surfaces. *See* Shannon, *Lead Intoxication in Infancy*, 89 Pediatrics 87 (January 1992) ("Home renovation, when not being done for the purpose of deleading, has been identified as a significant predictor of elevated lead levels in children. Use of heat guns and sanding create particularly toxic lead fumes or lead dust which are efficiently absorbed after ingestion and/or inhalation.").

sense tells us that lead paint that never leaves a wall or ceiling does not cause harm. Implicit in the Negligence Complaint. . .must be an allegation that the lead paint somehow separated from the wall or ceiling, and entered the air, or fell on the floor, furniture or fixtures in the apartment." *Lefrak Organization, Inc. v. Chubb Custom Ins. Co.*, 942 F. Supp. 949, 954 (S.D.N.Y. 1996).

¶ 43. The court of appeals adopted this theory in three cases, *United States Fire Ins. Co. v. Ace Baking Co.*, 164 Wis. 2d 499, 476 N.W.2d 280 (Ct. App. 1991); *Vance v. Sukup*, 207 Wis. 2d 578, 558 N.W.2d 683 (Ct. App. 1996), *vacated*, 211 Wis. 2d 529, 568 N.W.2d 297 (1997); and *Peace v. Northwestern Nat'l Ins. Co.*, No. 96–0328, unpublished slip op. (Wis. Ct. App. Feb. 4, 1997), *vacated*, 211 Wis. 2d 529, 568 N.W.2d 297 (1997).

¶ 44. In *Ace Baking*, an ice cream cone manufacturer stored ice cream cones in the same warehouse that stored a fabric softener containing the fragrance additive linalool. The linalool contaminated the ice cream cones, causing them to smell and taste like soap. The issue was whether the linalool was a pollutant and whether it had been released, discharged, or dispersed to cause property damage. The court found that linalool was a pollutant because it was a foreign substance which had contaminated the cones. The court then said:

> [I]t is a rare substance indeed that is *always* a pollutant; the most noxious of materials have their appropriate and non-polluting uses. Thus, for example, oil will "pollute" water and thus foul an automobile's radiator, but be essential for the engine's lubrication. Conversely, water can "pollute" oil and thus foul the engine, but be essential for the automobile's radiator. Here, although linal-

ool is a valued ingredient for some uses, it fouled Ace Baking's products. Accordingly it was a "pollutant" in relation to those products.

*Ace Baking*, 164 Wis. 2d at 505 (emphasis in original).

¶ 45. In *Vance*, the court built on its analysis in *Ace Baking*. As here, *Vance* involved a minor allegedly injured by lead-based paint in his rented premises. The court said:

> We agree with the trial court's conclusion. . .that lead is not a "contaminant" in paint to which it was added deliberately by the manufacturer, any more than the fragrance linalool in *Ace Baking* was a contaminant in the fabric softener. . . .As we noted in *Ace Baking*, a substance's status as either a valued ingredient or a contaminant depends on where it is:. . .Once the lead escaped from the painted surfaces, however, either by leaving the paint or because the paint itself chipped off, the lead became a "contaminant"–a substance that did not belong in its new environment, just as *Ace Baking's* linalool became a contaminant once it left the fabric softener.

*Vance*, 207 Wis. 2d at 583–84.

¶ 46. The court ruled that lead paint ingested from "intact accessible painted surfaces" had not discharged, dispersed, seeped, migrated, released, or escaped and thus was not covered by the pollution exclusion clause. *Id.* at 585. By implication, lead that had left "intact accessible painted surfaces" through paint chips, flakes, and dust *had* discharged, dispersed, released, or escaped.

¶ 47. The implication was confirmed in the first *Peace* opinion, where the court of appeals said:

> We conclude that our recent decision, *Vance v. Sukup.* . .is dispositive of this case. In *Vance*, we analyzed whether an insurer had a duty to defend based on whether there was coverage arising from a child's "ingesting lead derived from intact accessible painted surfaces, paint chips, paint flakes and dust that was contaminated with lead derived from lead based paint at the premises. . . ." We concluded that, analogous to the fabric softener in *Ace Baking*, lead paint was a contaminant under the pollution exclusion clause "[o]nce the lead escaped from the painted surfaces. . .either by leaving the paint or because the paint itself chipped off. . . ." We went on to conclude, however, that the insurer nevertheless had a duty to defend because the plaintiff's complaint had also alleged injury resulting from "intact" accessible painted surfaces. By contrast, the Peace complaint fails to allege any injury resulting from lead other than that "derived from paint chips, paint flakes and dust."

*Peace*, slip op. at 5.

¶ 48. After considering the analysis in these cases, we conclude that the pollution exclusion clause in Djukic's policy excludes bodily injury from the ingestion of lead in paint that chips, flakes, or breaks down into dust or fumes. When the "pollutant" lead—once contained—begins to disperse, discharge, or escape from the containment of the painted surface, it falls within the plain language of the pollution exclusion clause.[16]

---

[16] In the many lead paint cases, courts have struggled with the metaphysical question of exactly what the "pollutant" is. We conclude that "lead" is always a solid contaminant or "pollutant" in the same way that a loaded pistol is a dangerous weapon, even when it is locked up in a gun case, and a mamba is a deadly poisonous snake, even when it is confined in a reptile house.

¶ 49. The following courts have reached the same conclusion: *Shalimar Contractors Inc. v. American States Insurance Co.*, 975 F. Supp. 1450 (M.D. Ala. 1997); *St. Leger v. American Fire & Casualty Ins. Co.*, 870 F. Supp. 641 (E.D. Pa. 1994), aff'd without opinion, 61 F.3d 896 (3rd Cir. 1995); *Kaytes v. Imperial Casualty & Indemnity Co.*, No. Civ. A 93–1573, 1994 WL 780901 (E.D. Pa. Jan. 6, 1994); *Auto-Owners Ins. Co. v. Hanson*, 588 N.W.2d 777 (Minn. App. 1999); *Oates by Oates v. State*, 597 N.Y.S.2d 550 (N.Y. Ct. Cl. 1993), appeal withdrawn after settlement, 615 N.Y.S. 2d 993 (1st Dep't 1994); *cf. U.S. Liability Ins. Co. v. Bourbeau*, 49 F.3d 786 (1st Cir. 1995).

¶ 50. A contrary conclusion was reached in *Sphere Drake Ins. Co. v. P.L.C. Realty Co.*, 990 F. Supp. 240 (S.D.N.Y. 1997); *Lefrak Organization, Inc. v. Chubb Custom Ins. Co.*, 942 F. Supp. 949 (S.D.N.Y. 1996); *Insurance Company of Illinois v. Stringfield*, 685 N.E.2d 980 (Ill. App. 1997); *Sullins v. Allstate Ins. Co.*, 667 A.2d 617 (Md. 1995); *Atlantic Mutual Ins. Co. v. McFadden*, 595 N.E.2d 762 (Mass. 1992); *Weaver v. Royal Ins. Co. of America*, 674 A.2d 975 (N.H. 1996); *Byrd v. Blumenreich*, 722 A.2d 598 (N.J. Super. Ct. App. Div. 1999); *General Accident Ins. Co. v. Idbar Realty Corp.*, 622 N.Y.S. 2d 417 (N.Y. Sup. Ct. 1994); *Generali-U.S. Brands v. Caribe Realty Corp.*, 612 N.Y.S. 2d 296 (N.Y. Sup. Ct. 1994); *Cepeda v. Varveris*, 651 N.Y.S. 2d 185 (N.Y. App. Div. 1996); *G.A. Ins. Co. v. Naimberg Realty Assoc.*, 650 N.Y.S. 2d 246 (N.Y. App. Div. 1996).

## III.

¶ 51. The first argument against the position we have taken is that the policy is ambiguous—that it can be given two different interpretations, one that pro-

vides coverage and one that does not. As noted above, a finding of ambiguity is generally fatal to the insurer because ambiguity will be interpreted in favor of the insured, inasmuch as the insurer wrote the words in the policy.

¶ 52. The first published case to interpret the pollution exclusion clause with respect to lead paint was *Atlantic Mutual Ins. Co. v. McFadden,* 595 N.E.2d 762 (Mass. 1992). The court declared that the pollution exclusion clause was ambiguous:

> We conclude that an insured could reasonably have understood the provision at issue to exclude coverage for injury caused by certain forms of industrial pollution, but not coverage for injury allegedly caused by the presence of leaded materials in a private residence. . . .There simply is no language in the exclusion provision from which to infer that the provision was drafted with a view toward limiting liability for lead paint-related injury. The definition of "pollutant" in the policy does not indicate that leaded materials fall within its scope.

*Id.* at 764. This language was cited with approval by the Maryland court in *Sullins,* 667 A.2d at 620, and the conclusion has been repeated several times.

¶ 53. However, in *St. Leger v. American Fire & Casualty Ins. Co.,* 870 F. Supp. 641 (E.D. Pa. 1994), one of the first cases following *McFadden,* the court disagreed. "Courts must not torture the policy language in order to 'create ambiguities where none exist.' " Quoting from *Kaytes v. Imperial Casualty & Indem. Co.,* No. 93–1573 (E.D.Pa. Jan. 6, 1994), the *St. Leger* court said: " '[l]ead is a chemical that irritates and contaminates.'. . .This is widely understood." *St. Leger,* 870 F. Supp. at 643.

¶ 54. By contrast, while the court in *Sullins*, 667 A.2d 617, acknowledged that the interpretation of the clause by the insurer was reasonable,[17] it asserted that the terms in the policy were susceptible to other interpretations. It said: "While lead is clearly 'toxic,' a reasonably prudent layperson may not view lead as a 'chemical.'. . .A reasonably prudent layperson may also interpret the terms 'contaminant' and 'pollutant' as *not* including lead paint." *Sullins*, 667 A.2d at 620 (emphasis in original).

¶ 55. This view was rebutted in *U.S. Liab. Ins. Co. v. Bourbeau*, 49 F.3d 786 (1st Cir. 1995), where the court said:

> In our view, the language of the Absolute Pollution Exclusion clause is clear and unambiguous on its face. It is plainly intended to be an absolute bar to coverage for "any form of pollution." The most notable aspect of the exclusion is its breadth—it applies to *all* releases of pollutants, as opposed to only those which are not "sudden and accidental.". . .After reading this definition of pollutant, we do not see how an objectively reasonable insured would expect to be covered for contamination of property caused by the removal and discharge of lead paint chips. In our view, an objectively reasonable person reading the Absolute Pollution Exclusion clause would consider lead paint both a "solid. . .contaminant" and a "toxic chemical." An objectively reasonable person would also consider lead paint chips "materials to

---

[17] The reasonableness of the interpretation was also noted by the court in *Weaver v. Royal Ins. Co. of America*, 674 A.2d 975, 977 (N.H. 1996). The court in *Lefrak Organization, Inc. v. Chubb Custom Ins. Co.*, 942 F. Supp. 949, 955 (S.D.N.Y. 1996), also admitted the policy could be read to include lead paint as a "pollutant."

be disposed of " or "waste." A reading of the specifi-
cally listed pollutants would only buttress this
interpretation. The non-exclusive list of irritants
and contaminants provides the insured a potpourri
of pollutants to consider, from smoke to toxic chemi-
cals. We fail to see how an objectively reasonable
insured could possibly believe that "smoke, vapor,
soot, [and] fumes" would be considered pollutants
while lead paint would not.

*Bourbeau*, 49 F.3d at 788–89 (emphasis in original).

¶ 56. Language inevitably creates some ambigu-
ity. See *Harnischfeger Corp. v. Harbor Ins. Co.*, 927
F.2d 974, 976 (7th Cir. 1991), where the court said:

Drafters cannot anticipate all possible interactions
of fact and text, and if they could the attempt to cope
with them in advance would leave behind a contract
more like a federal procurement manual than like a
traditional insurance policy.

Whether the nuances and imprecision of general lan-
guage equal ambiguity as a matter of law is a
determination influenced by perception and perspec-
tive. A court must do its best to ascertain the objective
expectations of the parties from the language in the
policy.

¶ 57. In two recent decisions involving lead
paint, courts have adopted a plain reading approach as
opposed to a technical reading approach in their focus
on the pollution exclusion clause. In *Shalimar Contrac-
tors, Inc. v. American States Ins. Co.*, 975 F. Supp.
1450, 1456–57 (M.D. Ala. 1997), the court said:

The Plaintiff does not assert that any particular
language in the present [pollution] exclusion is
ambiguous. The Plaintiff offers no contention that
any word or phrases in this exclusion could be rea-

134

sonably interpreted by people of ordinary intelligence to have two contradictory meanings. . . .

¶ 58. After reviewing such cases as *Lefrak, Sullins*, and *McFadden*, the court declared:

> The court finds. . .that such a laborious reading of the terms "discharge, disperal, (sic) release and escape" and "pollution" is not permitted under Alabama law. According to the Alabama Supreme Court, the terms of an insurance exclusion "should be given the meaning that a person of ordinary intelligence would reasonably think the language had." Under that directive, the court finds that the terms in an insurance exclusion cannot be defined by resort to the highly technical and specific definitions under the environmental laws, such as those contained in the Code of Federal Regulations. . . .The court agrees with American that it cannot be seriously contended that lead is not a pollutant within the meaning of the pollution exclusion.

*American States*, 975 F. Supp. at 1457.

¶ 59. In *Auto-Owners Ins. Co. v. Hanson*, 588 N.W.2d 777 (Minn. Ct. App. 1999), the court followed *Board of Regents v. Royal Ins. Co.*, 517 N.W.2d 888 (Minn. 1994), where the court applied "a non-technical, plain-meaning approach to interpreting a pollution exclusion, and found that asbestos fibers qualified as an 'irritant' where the policy precluded from coverage damages caused by the 'discharge, dispersal, release or escape of. . .irritants.'. . .The court stated that it would be 'a disservice to the English language if we were to say that asbestos fibers, which are a health hazard because of their irritant effects on the human body, were not an irritant.' " *Id.* at 779. The court indicated that it would follow an ordinary meaning approach in analyzing the clause with respect to lead paint. "We

must read these cases [like *Sphere Drake Ins. Co.*] in the shadows of *Royal*, where the court rejected the terms-of-art approach." *Auto-Owners*, 588 N.W.2d at 780.

¶ 60. Looking at the text of the pollution exclusion clause in relation to the facts of this case, we conclude that the clause is not ambiguous. The key term in the clause—"pollutants"—is specifically defined in the policy; the definition cannot be undone by different notions of "pollution" outside the policy, unrelated to the policy language, unless such a "reading" produced absurd results. In the text here, the words are not fairly susceptible to more than one construction. The pollution exclusion clause does not become ambiguous merely because the parties disagree about its meaning, *Sprangers v. Greatway Ins. Co.*, 182 Wis. 2d 521, 537, 514 N.W.2d 1 (1994), or because they can point to conflicting interpretations of the clause by different courts. If the existence of differing court interpretations inevitably meant ambiguity, then only the first interpretation by a court would count.

¶ 61. Our decision in *Donaldson v. Urban Land Interests, Inc.*, 211 Wis. 2d 224, 564 N.W.2d 728 (1997), is not inconsistent with this conclusion. *Donaldson* was a "sick building" case in which Hanover Insurance Company attempted to exclude liability for the consequences of an inadequate air exchange system in a building. The building defect caused an excessive accumulation of carbon dioxide in the work area. Hanover attempted to categorize exhaled carbon dioxide as a pollutant, justifying its invocation of the pollution exclusion clause. This court disagreed. We approved the analysis of Judge Daniel Anderson of the court of appeals, who dissented, saying that "a reasonable

insured would not expect [the clause] to include the avoidance of liability for the accumulation of carbon dioxide in an office because provisions were not made for introducing fresh air into the office." *Id.* at 229. (citation omitted)

¶ 62. This court found the pollution exclusion clause did not apply to the particular facts of that case. We stated: "The pollution exclusion clause at issue here was intended. . .to have broad application. However, we are not satisfied that this fact brings exhaled carbon dioxide unambiguously within the policy definition of 'pollutant.' Instead, we agree with Judge Anderson's dissent that the pollution exclusion clause does not plainly and clearly alert a reasonable insured that coverage is denied for personal injury claims that have their genesis in activities as fundamental as human respiration." *Id.* at 231–32. The court contrasted exhaled carbon dioxide with the nonexhaustive list of pollutants in the pollution exclusion clause and observed that exhaled carbon dioxide is universally present and generally harmless in all but the most unusual circumstances. *Id.* at 234. The same cannot be said for lead paint chips, flakes, and dust. They are widely, if not universally, understood to be dangerous and capable of producing lead poisoning.[18] The toxic

---

[18] "The problem of childhood lead poisoning caused by the ingestion of lead-based paints has reached epidemic proportions in most of our large cities. . . .The accessibility to flaking or peeling lead-based paint and to broken plaster, along with the lack of knowledge among parents that ingestion of such substances is dangerous and even lethal, is responsible for lead poisoning. . . .Lead poisoning is a kind of pollution, a man-made disease. . . . It is a needless cause of mental retardation and death in young children." LEAD-BASED PAINT POISONING PREVENTION ACT, S. Rep. No. 1432, 91st Cong., 2nd Sess.

effects of lead have been recognized for centuries.[19] Reasonable owners of rental property understand their obligation to deal with the problem of lead paint.

## IV.

¶ 63. A second and related argument against our conclusion is that, although the words in the exclusion may be plain, an insured would not anticipate any literal application of those words to a lead paint injury; rather, a reasonable insured would expect coverage. This argument has several parts. First, it is argued, the exclusion does not expressly apply to lead paint-related injuries. Second, no widely-used consumer products or household products are enumerated in the exclusion. Third, the words "discharge," "dispersal," "release," and "escape" are environmental terms of art. Thus, a reasonable insured could have understood the exclusion to preclude coverage for injury caused by industrial pollution but not for injury arising from leaded materials in a residence. Finally, it is unreasonable to apply the pollution exclusion clause to routine incidents such as paint peeling off a wall.

1970, U.S.C.C.A.N. 6131. *See also* Council of Planning Librarians: *Lead Poisoning in Urban Children: An Annotated Bibliography*, October 1976. This publication lists 241 articles dating from November, 1943 to June, 1975 concerning lead poisoning. "The serious health hazard posed to children by exposure to lead-based paint is by now well established." *Juarez*, 672 N.E.2d at 139.

[19] In the second century B.C., Greek physician Dioscorides said that "lead makes the mind give way." *Lead Poisoning: From Screening to Primary Prevention*, 92 Pediatrics 176 (July, 1993). "Lead poisoning was described in the second century B.C. by the Greek physician-poet Nicander." 46 Am Jur Proof of Facts 2d 150, 154 (1986).

## A.

¶ 64. Once again, the term "pollutants" is defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed." While it is true that the definition makes no specific reference to lead or to any consumer or household products, it is also true that the definition in the exclusion does not mention *any* heavy metals or other notorious pollutants, covering them instead by broad language.[20]

## B.

¶ 65. Throughout the country, injured parties and insured parties have resorted to the history of the pollution exclusion clause in an effort to show that it was intended to apply to industrial pollution and that the terms "discharge," "dispersal," "release," and "escape" are environmental terms of art.

¶ 66. In *Sphere Drake Ins. Co. v. Y.L. Realty Co.*, 990 F. Supp. 240, 243 (S.D.N.Y. 1997), the court summarized its view of the law as follows:

> Several courts recently have interpreted pollution exclusion clauses similar to the one at issue here.

---

[20] In *Oates by Oates v. State*, 597 N.Y.S.2d. 550, 553–54 (N.Y. Ct. Cl. 1993), the court said:

> [The question is] whether lead paint is a pollutant within the definition. CUNY argues that it is not because neither lead nor paint nor lead paint are specifically listed in the definition section of the policy as pollutants. . . .It is indisputable, however, that lead paint is a chemical and a contaminant that can irritate or poison. . .and falls within the general tenor of the specifically listed pollutants. Moreover, what would CUNY have USF&G do: list every harmful chemical known to man in the definition section. At some point, reality must be incorporated by reference.

The overwhelming trend in these cases has been to hold that such clauses do not exclude contaminants such as lead paint poisoning. . . .These courts have held, and this Court agrees, that pollution exclusion clauses refer only to industrial and environmental pollution. . . .The language of the exclusion clause supports this interpretation. The clause discusses injuries caused by "discharge, dispersal, release or escape of pollutants." These are terms of art in environmental law, generally used to describe the improper disposal or containment of hazardous waste. *Tufco Flooring*, 409 S.E.2d at 699.

¶ 67. The problem in dealing with this argument is that it calls for construction of the pollution exclusion clause based on materials outside the four corners of the policy. In most jurisdictions, courts interpreting insurance contracts do not go outside the four corners of the policy unless and until they find ambiguity in the policy's terms. *Cf. Stanhope v. Brown County*, 90 Wis. 2d 823, 848, 280 N.W.2d 711 (1979). However, once a court finds ambiguity in the policy, it almost automatically rules against the insurer. The Catch–22 in insurance cases is that once ambiguity has been found, the insurer will lose even if the insurer has the better argument about how to construe its clause based on evidence outside the insurance contract.

¶ 68. Because we conclude that the clause is not ambiguous, we have no duty to explore materials outside the policy. Nonetheless, in the interest of intellectual integrity, the argument deserves response.

¶ 69. The history of the pollution exclusion clause was set out in a recent law review article: Shelly and Mason, *Application of the Absolute Pollution Exclusion to Toxic Tort Claims: Will Courts Choose Pol-*

*icy Construction or Deconstruction?* 33 TORT & INS. L.J. 749 (1998).

¶ 70. In 1966, comprehensive general liability (CGL) insurance policies contained a broad coverage clause reading:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage caused by accident.

Quoted in Greenlaw, *The CGL Policy and the Pollution Exclusion Clause: Using the Drafting History to Raise the Interpretation Out of the Quagmire*, 23 COLUM. J.L. & SOC. PROBS. 233, 235 (1990).

¶ 71. In 1970, the standard CGL policy was revised to include a Qualified Pollution Exclusion, which excluded coverage for claims:

> Arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants *into or upon the land, the atmosphere or any water course or body of water but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.* (Emphasis in original.)

33 TORTS & INS. L.J. at 752.

¶ 72. In 1985, an Absolute Pollution Exclusion clause replaced the Qualified Pollution Exclusion clause. *Id.* at 753. The words of the new model clause are nearly identical to the clause in the Northwestern policy. The Absolute Pollution Exclusion (1) dropped the phrase "but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;" (2) dropped the phrase "into or upon the

land, the atmosphere or any water course or body of water;" (3) restructured the exclusion and added four conditional phrases including the key phrase "at or from premises you own, rent or occupy;" and (4) dropped the adjective "toxic" before the word "chemicals." The Shelley-Mason article provides an explanation why these changes were made. We do not have to adopt their explanations in order to comprehend that the 1985 revision substantially broadened the pollution exclusion and made it applicable to premises owned, rented, or occupied by the insured. Removing the adjective "toxic" before the noun "chemical" had the effect of expanding the number of chemicals regarded as pollutants. We find these undisputed changes in the clause inconsistent with the proposition that the clause, after revision, was intended to apply solely to industrial pollution. We agree with the court in *Oates by Oates v. New York*, 597 N.Y.S.2d 550, 553 (N.Y. Ct. Cl. 1994), when it said: "In all candor, we cannot imagine a more unambiguous statement of intent than, after being told by the courts that 'land, atmosphere and water course' imply industrial pollution, to replace such language with 'premises you own, rent or occupy.' "

¶ 73. The seminal case relied upon by *McFadden* acknowledged the changes in the CGL but denied that they had any significance. *West American Insurance Co. v. Tufco Flooring East, Inc.*, 409 S.E.2d 692 (N.C. Ct. App. 1991), stated:

> [T]he pollution exclusion applies only to discharges into the environment. Both the historical purpose underlying the pollution exclusion and operative policy terms indicate that a discharge into the environment is necessary for the clause to be applicable.

142

> The historical purpose of the pollution exclusion limits the scope of the exclusion to environmental damage. When the pollution exclusion was first instituted in the early 1970's, it applied, by its own terms, only to discharges of pollutants "into or upon land, the atmosphere or any water course or body of water. . . ."
>
> . . .
>
> In 1985, the insurance industry amended the pollution exclusion clause in the standard commercial liability policy in order to clarify certain issues that had arisen regarding the interpretation of the provision. . . .Even though the new pollution exclusion does omit language requiring the discharge to be "into or upon land, the atmosphere or any water course or body of water". . . .this Court. . .refuses to change the historical limitation that the pollution exclusion clause does not apply to non-environmental damage.

*West American*, 409 S.E.2d at 699.

¶ 74. Then the court went on to assert that the terms employed in the clause "imply that there must be a discharge into the environment before coverage can be properly denied." *Id*.

> The operative terms in the version of the pollution exclusion clause at issue in this case are "discharge," "dispersal," "release," and "escape." While they are not defined in the policy, *the terms "discharge" and "release" are terms of art in environmental law and include "escape" by definition and "dispersal" by concept.* (Emphasis supplied.)

*Id*. To support this sweeping claim, the court cited federal regulations interpreting the Resource, Conservation and Recovery Act (RCRA), Section

143

1004(3), namely, 40 C.F.R. § 260.10 (1990); and § 101(22) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601(22) (1988). *Id.* at 699–700.

¶ 75. The Resource, Conservation and Recovery Act was approved in 1976,[21] and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 was approved in 1980.[22] The Qualified Pollution Exclusion clause used the four terms at issue in 1970. The two authorities cited by the court do not prove the hypothesis that these four common terms are terms of art for industrial pollution.

¶ 76. A quick check of the Wisconsin Statutes shows that these terms are used in many situations completely unrelated to the environment, including criminal law. Citing a multitude of criminal justice statutes that use these common terms would not transform the terms into criminal justice terms of art.

## C.

¶ 77. The final contention is that it is unreasonable to apply the pollution exclusion clause to routine incidents such as paint peeling off a wall. For this proposition, Peace cites *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043–44 (7th Cir. 1992), where the court said:

Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results .

To redress this problem, courts have taken a common sense approach when determining the scope of pollution exclusion clauses. . . .[citing three cases,

[21] Pub.L. 94–580, October 21, 1976, 90 Stat. 2795.
[22] Pub.L. 96–510, December 11, 1980, 94 Stat. 2767.

including *McFadden*] The bond that links these cases is plain. All involve injuries resulting from everyday activities gone slightly, but not surprisingly, awry. There is nothing unusual about paint peeling off a wall, asbestos particles escaping during the installation or removal of insulation, or paint drifting off the mark during a spray-painting job. A reasonable policyholder, these courts believed, would not characterize such routine incidents as pollution.

¶ 78. More urgency was expressed toward the problem of lead poisoning from paint in an award-winning law review article by Martha R. Mahoney, who wrote:

Six hundred seventy-five thousand American children are estimated to have blood lead levels indicating lead toxicity. Four to five million more have blood lead levels associated with impaired neurological and intellectual functions. The two most important sources of exposure among children are lead-based paint and household dust.

Martha R. Mahoney, *Four Million Children at Risk: Lead Paint Poisoning Victims and the Law*, 9 STAN. ENVTL. L.J. 46–47 (1990). The scope and gravity of lead poisoning prompted the United States Department of Health and Human Services to say in 1991 that childhood lead poisoning was "the most important environmental health problem for young children." 92 Pediatrics 176 (1993).

¶ 79. Even though substantial progress has been made in reducing the sources of lead contamination, the Committee on Environmental Health of the American Academy of Pediatrics issued a report in 1998 which stated, in part, that "lead remains a common, preventable environmental health threat." *Screening*

*for Elevated Blood Lead Levels*, 101 Pediatrics 1072 (1998). The Environmental Protection Agency, Office of Pollution Prevention and Toxics, continues to issue publications warning homeowners of the importance of lead abatement in homes built before 1978.

¶ 80. This court could devote pages to a twentieth century history of the evolving awareness of lead poisoning in the home and workplace and the role of lead-based paint in this national problem. By the mid–1980s, recognition of the problem was widespread.[23] Congress had passed the Lead-Based Paint Poisoning Prevention Act of 1971, strengthened it in 1973, and revised it again in 1988. States, including Wisconsin, had taken legislative action.[24] Many local governments, including the City of Milwaukee, had enacted ordinances and developed lead poisoning prevention and screening programs.[25]

---

[23] *Antwaun A. v. Heritage Mut. Ins. Co.*, 228 Wis. 2d 44, 58–60, 596 N.W.2d 456, 463 (1999), cites additional legislation identifying the dangers associated with lead paint.

[24] Wisconsin Stat. § 151.03 (1987–88), part of the Toxic Substances subchapter of the Environmental Health chapter, forbid any person from applying lead-bearing paints to any exposed surface on the inside of a dwelling, the exposed surface of a structure used for the care of children, or any fixture or other object placed in or upon any exposed surface of a dwelling and ordinarily accessible to children. Wisconsin Stat. § 151.03 was subsequently amended by 1993 Act 27, § 431, and renumbered as Wis. Stat. § 254.12.

[25] In August 1987, Milwaukee Mayor Henry Maier suggested the fight against lead poisoning required a new city ordinance that would force building owners to remove lead based paint. Don Behm, *Unsafe lead levels found in 10% of children tested*, Milw. J., August 24, 1987. This led to a new ordinance adopted in 1988 that stated, in part: "Any lead based substance, surface or object which may contribute to an

¶ 81. We do not believe it is necessary to detail all the articles in professional journals as well as newspapers, popular magazines, and business publications, and all the government reports and regulations, to support our conclusion that by the mid–1980s, an ordinary property owner could not reasonably expect to purchase a standard liability insurance policy with a pollution exclusion clause, and thereby shift to the insurer liability for personal injuries arising from a person's ingestion of lead in chipped or flaked paint or dust at or from the insured premises. The phrase "at or from premises you own, rent, or occupy" directly counters the notion that the policy is confined to industrial pollution, for there is not much familiarity with industrial pollution from rented apartments.

¶ 82. Djukic received a citation from the City of Milwaukee's Bureau of Inspection and Environmental Health six weeks before Djukic purchased the Northwestern policy. This citation would not ordinarily help explain the pollution exclusion clause. However, we note that the citation said in part:

> A recent inspection of premises at the above address disclosed the presence of loose, peeling, flaking or chipped paint which contained a hazardous concentration of lead. These conditions tend to cause a disease known as lead poisoning. You are hereby notified that each condition listed below is a violation. . .and *immediate corrective action is required to protect the public health. You are hereby directed to permanently correct these hazardous conditions.* . . .For your information, a brochure dealing with

increased body burden of lead due to its condition, location or nature, or which is easily accessible to children, is declared a public health hazard and nuisance as defined in s. 80–1–2." Milwaukee Ordinance 66–22 (April 1, 1988).

the permanent elimination of lead paint hazards is enclosed. . . .

A reinspection will be made after an elapse of thirty days following service of this order. . . . (Emphasis supplied.)

¶ 83. Northwestern's pollution exclusion clause reads in part:

The policy excludes coverage for:

. . .

(2) Any loss, cost, or expense arising out of any governmental direction or request that you test for, monitor, *clean up, remove, contain,* treat, detoxify or neutralize *pollutants.* (Emphasis supplied.)

¶ 84. A reasonable insured property owner would not believe that this quoted exclusion did not apply to the kind of corrective action ordered in the citation.

## V.

¶ 85. In interpreting the pollution exclusion clause in Djukic's insurance policy, we conclude that lead present in paint in a residential property is a pollutant. We further conclude that when lead-based paint either chips, flakes, or deteriorates to dust, that action is a discharge, dispersal, release, or escape within the meaning of the terms in the policy. As a result, the policy excludes coverage for lead poisoning injuries arising out of the ingestion of lead derived from lead-based paint chips, flakes, or dust. Accordingly, the decision of the court of appeals is reversed and the cause is remanded to the circuit court.

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded.

¶ 86. ANN WALSH BRADLEY, J. (*concurring*). I join the majority opinion. I write separately only to respond to the interpretation of *Donaldson v. Urban Land Interests. Inc.*, 211 Wis. 2d 224, 564 N.W.2d 728 (1997), rendered by Justice Crooks' dissent, and to address that dissent's mischaracterization of the majority opinion.

¶ 87. According to the dissent, the majority opinion is "blatant[ly] inconsisten[t]" with *Donaldson.* Justice Crooks' dissent at 156. I disagree. Rather, I am convinced that any inconsistency between *Donaldson* and the majority opinion is the result of that dissent's errant reading of *Donaldson.*

¶ 88. The dissent asserts that the majority opinion is inconsistent with *Donaldson* because the opinion concludes that the pollution exclusion clause is unambiguous when "only two years ago [this court concluded] that the very same clause *is* ambiguous." Justice Crooks' dissent at 155 (emphasis in original). However, that is not what this court said in *Donaldson.* We said:

> The pollution exclusion clause at issue here was intended. . .to have broad application. However, we are not satisfied that this fact brings exhaled carbon dioxide unambiguously within the policy definition of "pollutant." *Donaldson*, 211 Wis. 2d at 231–32.

The focus of our inquiry was on the substance at issue—carbon dioxide—not on the terms of the policy.

¶ 89. Indeed, the unique substance at issue drove this court's decision in *Donaldson.* Quite simply, the

involuntary exhaling of carbon dioxide cannot reasonably be considered the "release" of "pollution." As we said in *Donaldson*, the pollution exclusion clause of the policy does not encompass "claims that have their genesis in activities as fundamental as human respiration." *Donaldson*, 211 Wis. 2d at 232.

¶ 90. In assessing coverage for the release of a pollutant, the act of human breathing is in sharp contrast to the peeling of lead paint from residential surfaces. Lead is a substance that has been recognized for centuries as harmful. It is a substance that is heavily restricted by the modern regulatory state. As the majority correctly points out, while lead may have been intentionally added to paint, its release from the painted surface in the form of dust or chips is the release of a pollutant.

¶ 91. Finally, I address the mischaracterization of the majority opinion as an "apparent assault on child victims of lead poisoning." Justice Crooks' dissent at 165. Such an attack obfuscates rather than illuminates the discussion. This case is not about whether one is for or against "child victims." It is about the interpretation of an exclusionary clause in a policy of insurance.

¶ 92. In interpreting the language of this insurance policy it should make no difference if those seeking coverage are children or adults. It should make no difference if the claim involves one child or many children. The interpretation of the language of an insurance policy should not be influenced in such a result-oriented way. Accordingly, I concur.

¶ 93. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE (*dissenting*). As the majority opinion carefully documents, courts around the country have

divided over the proper interpretation of the pollution exclusion clause. Majority op. at 130–31. When numerous courts disagree about the meaning of language, the language cannot be characterized as having a plain meaning. Rather, the language is ambiguous; it is capable of being understood in two or more different senses by reasonably well-informed persons even though one interpretation might on careful analysis seem more suitable to this court. *Lincoln Savings Bank, S.A. v. DOR*, 215 Wis. 2d 430, 452, 573 N.W.2d 522 (1998) (Abrahamson, C.J., concurring).

¶ 94. I would hold that a reasonable person in the position of the insured would reasonably expect liability coverage. The pollution exclusion clause does not plainly and clearly alert a reasonable insured that coverage is denied for personal injury claims arising from lead paint. Therefore the pollution exclusion clause should be construed narrowly against the insurer with any ambiguity resolved in favor of coverage. *Donaldson v. Urban Land Interests, Inc.*, 211 Wis. 2d 224, 230, 564 N.W.2d 728 (1997).

¶ 95. For this reason, I dissent.

¶ 96. N. PATRICK CROOKS, J. (*dissenting*). The result of the majority opinion is to deprive young Kevin Peace, and, in many instances, other child victims of lead poisoning, of an effective remedy for their harm. By stripping landlords who may have been negligent concerning lead-based paint of insurance coverage, the majority guarantees that, frequently, no damages will ever be collected for such children. In reaching its conclusion, the majority fails to apply the proper method for analyzing whether an insurer has a duty to defend, disregards this court's two-year-old decision in *Donald-*

*son v. Urban Land Interests, Inc.*, 211 Wis. 2d 224, 564 N.W.2d 728 (1997), and ignores the well-established principle that insurance policies are to be interpreted from the perspective of the reasonable insured with any ambiguities construed in the insured's favor.

¶ 97. Somewhere in the course of its lengthy discussion, the majority loses sight of the issue in front of this court: whether summary judgment was appropriately granted to Northwestern on the issue of Northwestern's *duty to defend* its insured in this action. There is no analysis whatsoever of the duty to defend in the majority opinion. This court has recently and often explained the method to be employed by courts when analyzing whether an insurer has a duty to defend.[1] The question in such an analysis is *not* whether the claim is actually covered under the insurance policy. *See General Cas. Co. v. Hills*, 209 Wis. 2d 167, 176 & n.11, 561 N.W.2d 718 (1997). *See also School Dist. of Shorewood v. Wausau Ins. Cos.*, 170 Wis. 2d 347, 364, 488 N.W.2d 82 (1992). "The duty to defend is broader than the duty to indemnify, because the duty to defend is triggered by arguable, as opposed to actual, coverage." *General Cas.*, 209 Wis. 2d at 176 n.11.

¶ 98. In determining whether there is a duty to defend, a court must compare the allegations in the complaint to the relevant insurance policy. *See id.*; *Shorewood*, 170 Wis. 2d at 364–65. An insurer has a

---

[1] *See, e.g., Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 593 N.W.2d 445, 459 (1999); *Doyle v. Engelke*, 219 Wis. 2d 277, 284–85, 580 N.W.2d 245 (1998); *General Cas. Co. v. Hills*, 209 Wis. 2d 167, 176 & n.11, 561 N.W.2d 718 (1997); *Newhouse ex rel. Skow v. Citizens Sec. Mut. Ins. Co.*, 176 Wis. 2d 824, 834–35, 501 N.W.2d 1 (1993); *School Dist. of Shorewood v. Wausau Ins. Cos.*, 170 Wis. 2d 347, 364, 488 N.W.2d 82 (1992).

duty to defend whenever the allegations in the complaint would, if proved, result in a "possibility of recovery that falls under the terms and conditions of the insurance policy." *General Cas.*, 209 Wis. 2d at 176 (quoting *Shorewood*, 170 Wis. 2d at 364). *See Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 593 N.W.2d 445, 459 (1999). "Any doubt as to the existence of the duty to defend must be resolved in favor of the insured." *Wausau Tile*, 593 N.W.2d at 459. *See General Cas.*, 209 Wis. 2d at 176; *Shorewood*, 170 Wis. 2d at 364.

¶ 99. In the instant case, the circuit court granted summary judgment to Northwestern, reasoning that Northwestern had no duty to defend because the allegations in Peace's complaint fell within the pollution exclusion clause of the insurance policy. If there is any possibility that Peace's claims, if proved, would result in liability under the terms of the policy, the above principles require this court to hold that Northwestern has a duty to defend, and thus, that the summary judgment was improper. Our task, then, is to examine the pollution exclusion clause to determine whether there is any possibility that Peace's claims might be covered.

¶ 100. In *Donaldson*, this court interpreted a pollution exclusion clause identical in all relevant aspects to the clause in this case. *See Donaldson*, 211 Wis. 2d at 228. We held that in order for this pollution exclusion clause to apply to a particular set of facts, two conditions must be satisfied: (1) the alleged pollutant must fit "unambiguously within the pollution exclusion clause's definition of 'pollutant' "; and (2) the alleged pollutant must have been "discharge[d], disperse[d], etc., under the terms of the polic[y]." *Id.* at 229.

¶ 101. I begin by examining whether lead in paint unambiguously falls within the insurance policy's definition of "pollutant." It is well established that terms in an insurance policy are ambiguous if they are fairly susceptible to more than one reasonable interpretation when read in context. *Id.* at 230–31. *See Kremers-Urban Co. v. American Employers Ins.*, 119 Wis. 2d 722, 735, 351 N.W.2d 156 (1984). Equally well established is the rule that terms in an insurance policy must be interpreted from the perspective of the "reasonable insured." *See Donaldson*, 211 Wis. 2d at 230 (citing *General Cas.*, 209 Wis. 2d at 175); *Kremers-Urban*, 119 Wis. 2d at 735. The words in the policy must be given the common, everyday meanings which would be attributed to them by a lay person. *Kremers-Urban*, 119 Wis. 2d at 735.

¶ 102. At first glance, the terms in the policy definition of "pollutant" might seem broad enough to include lead in paint.[2] The majority determines that "pollutant" unambiguously includes lead in paint, focusing almost exclusively on the words "contaminant" and "irritant" in the policy definition. *See* majority op. at 125–26.

¶ 103. However, the majority's approach directly contravenes this court's recent decision in *Donaldson*. The majority concludes that the pollution exclusion clause is unambiguous, despite our conclusion only two

---

[2] Perhaps Northwestern even intended the words "contaminant" or "irritant" in the clause to include lead in paint. Even if this were the case, however, it would not answer the question of whether the definition of "pollutant" unambiguously includes lead. In *Donaldson v. Urban Land Interests, Inc.*, 211 Wis. 2d 224, 231–32, 564 N.W.2d 728 (1997), we found that the insurer's intention that the pollution exclusion clause be interpreted broadly did not control our interpretation of the clause.

154

years ago that the very same clause *is* ambiguous. *See* majority op. at 136–37; *Donaldson*, 211 Wis. 2d at 233. In *Donaldson*, we were concerned that the words "irritant" and "contaminant" in the clause, "when viewed in isolation, are virtually boundless, for there is virtually no substance or chemical in existence that would not irritate or damage some person or property." *Id.* at 232 (quoting *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037 (7th Cir. 1992)). We held that "[t]he reach of the pollution exclusion clause must be circumscribed by reasonableness, lest the contractual promise of coverage be reduced to a dead letter." *Id.* at 233.

¶ 104. Based on our determination that the scope of the pollution exclusion clause is restricted to reasonable applications, we did not focus in *Donaldson* on the broad terms of the pollution exclusion clause, such as "irritant," "contaminant," and "chemicals." Instead, in considering whether carbon dioxide was unambiguously included within the clause, we carefully evaluated the expectations of the reasonable insured. *See id.* at 232–34. We stressed the "common sense" approach taken by courts in determining when the pollution exclusion clause is applicable. *Id.* at 233 (quoting *Pipefitters*, 976 F.2d at 1043–44). Because a reasonable insured would not necessarily understand carbon dioxide to be a "pollutant," we determined that the carbon dioxide was not unambiguously included within the definition of "pollutant" in the pollution exclusion clause. *Id.* at 232–34.

¶ 105. *Donaldson*, therefore, precludes a finding that an alleged pollutant is covered by the pollution exclusion clause simply because it is capable of fitting within the broad classifications of "contaminant" or "irritant." The majority's expansive reading of the pol-

lution exclusion clause effectively nullifies this court's decision in *Donaldson* that the scope of the clause "must be circumscribed by reasonableness."[3] *Donaldson*, 211 Wis. 2d at 233.

¶ 106. The majority attempts to justify the blatant inconsistency between its conclusion and this court's holding in *Donaldson* by stating that unlike the carbon dioxide involved in *Donaldson*, "[t]he toxic effects of lead have been recognized for centuries." Majority op. at 137–38.

¶ 107. The majority misses the point of *Donaldson* and ignores its plain applicability in this case. It is clear from our decision in the wake of *Donaldson* to vacate the court of appeals' original opinion in this case

[3] The majority's overly broad reading of the pollution exclusion clause could have wide-ranging effects, as evidenced by the following examples discussed in *Donaldson*:

> [R]eading the clause broadly would bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants or contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution.

*Donaldson*, 211 Wis. 2d at 233 (quoting *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043–44 (7th Cir. 1992)).

Similarly, it has been argued that a broad reading of the pollution exclusion clause as covering all "contaminants" or "irritants" would render the policy's coverage illusory, because "scalding water from a faucet can irritate, spoiled food can poison, or trash (i.e., waste paper) on a stairway can cause a fall." *Oates by Oates v. New York*, 597 N.Y.S.2d 550, 553 (N.Y. Ct. Cl. 1993). The *Oates* court described this argument as "well taken," even though the court ultimately found that lead was a "pollutant." *Id.* at 553–54.

that we felt that our holding in *Donaldson* affected the outcome of this case,[4] yet the majority today reaches the very same conclusion as that reached by the court of appeals in the opinion we vacated!

¶ 108. Further, in *Donaldson*, we concluded that a reasonable insured would not necessarily understand carbon dioxide to be a "pollutant" because carbon dioxide build-up and inhalation is an "everyday activity 'gone slightly, but not surprisingly, awry.' " *Donaldson*, 211 Wis. 2d at 233 (quoting *Pipefitters*, 976 F.2d at

[4] The procedural history of this case evinces this court's obvious opinion that our holding in *Donaldson* would have a significant effect on the analysis of this case, which involves the very same pollution exclusion clause. Prior to *Donaldson*, the court of appeals determined in this case that the pollution exclusion clause precluded coverage for Peace's alleged injuries. *See Peace v. Northwestern Nat'l Ins. Co.*, No. 96–0328, unpublished slip op. at 5 (Wis. Ct. App. Feb. 4, 1997) (*per curiam*). Following *Donaldson*, we vacated the court of appeals' decision and remanded the matter for another decision in light of *Donaldson*. *See Peace v. Northwestern Nat'l Ins. Co.*, 211 Wis. 2d 529, 568 N.W.2d 297 (1997). We also vacated the case upon which the court of appeals primarily relied, *Vance v. Sukup*, 207 Wis. 2d 578, 558 N.W.2d 683 (Ct. App. 1996). *See Vance v. Sukup*, 211 Wis. 2d 529, 568 N.W.2d 297 (1997).

In its second decision in this case, the court of appeals determined, in light of *Donaldson*, that the clause did not preclude coverage for Peace's injuries. *See Peace v. Northwestern Nat'l Ins. Co.*, 215 Wis. 2d 165, 167, 573 N.W.2d 197 (Ct. App. 1997). Curiously, the majority of our court today reverses the court of appeals' second decision and reaches the same conclusion as that reached by the court of appeals in its initial decision, which we vacated after *Donaldson*. It is unclear how citizens of this state are to derive guidance from decisions of this court when we set forth inconsistent interpretations of the same pollution exclusion clause in cases only two years apart.

1043–44). The language from *Pipefitters* which we chose to quote specifically listed peeling paint as an example of an "everyday activit[y] gone slightly, but not surprisingly awry." *Id.* at 233 (quoting *Pipefitters*, 976 F.2d at 1043–44).

¶ 109. Through its sparse discussion and dismissive treatment of *Donaldson*, the majority fails to acknowledge important and clearly applicable precedent from this court.[5] Contrary to the majority, I conclude that *Donaldson* mandates a thorough, common-sense analysis of whether a reasonable insured would interpret lead as unambiguously fitting within the definition of a "pollutant."

¶ 110. "Pollutant" is a term which generally conjures up images of industrial smokestacks and heavy machinery in the mind of a reasonable lay person. Dirty lakes, chemical-laden streams, and thick layers of smog typify the items which immediately occur to a person upon hearing the word "pollution." The pollution exclusion clause does not refer to "lead," "paint," or any other comparable term which might give a hint to a reasonable insured that common materials which are benign in normal circumstances could qualify as "pollutants."

¶ 111. Dictionary definitions likewise do not indicate that the term "pollutant" might encompass lead in paint. "Pollutant" is defined in the American Heritage Dictionary as, "Something that pollutes, especially a waste material that contaminates air, soil, or water." *American Heritage Dictionary* 1402 (3d ed. 1992). The relevant definitions of "pollute" are: "1. To

[5] Other courts have recognized that *Donaldson* is applicable when determining whether lead in paint is a "pollutant" under the pollution exclusion clause. *See, e.g., Danbury Ins. Co. v. Novella*, 727 A.2d 279, 281 (Conn. Super. Ct. 1998).

make unfit for or harmful to living things, especially by the addition of waste matter. . . .2. To make less suitable for an activity, especially by the introduction of unwanted factors: *The stadium lights polluted the sky around the observatory.* 3. To render impure or morally harmful; corrupt." *American Heritage Dictionary* 1402 (3d ed. 1992).

¶ 112. The lead in paint does not fit within these common definitions. Lead was not "waste matter" added to the paint in this case, and it was not an "unwanted factor" in the paint. On the contrary, lead was intentionally included as one of the desired ingredients in the paint at the time of the paint's original manufacture. For this reason, a reasonable lay person would not necessarily view the lead in paint as a "pollutant." As one court explained:

> A common understanding of a pollutant is a substance that "pollutes" or renders impure a previously unpolluted object, as when chemical wastes leach into a clean water supply. Here the lead did not pollute the paint: it was purposefully incorporated into the paint from the start. The paint was intentionally applied to the premises. At the time, the paint was legal. It was considered neither impure nor unwanted.

*Insurance Co. of Ill. v. Stringfield,* 685 N.E.2d 980, 983–84 (Ill. App. Ct. 1997). *See also West Am. Ins. Co. v. Tufco Flooring East, Inc.,* 409 S.E.2d 692, 698 (N.C. Ct. App. 1991) (holding that vapors from flooring resin were not a "pollutant" because flooring resin was not an unwanted "contaminant" at the time it was intentionally brought onto the premises). It follows that the lead in paint is unlike the fabric softener which became attached to ice cream cones stored in the same ware-

house in *United States Fire Insurance Co. v. Ace Baking Co.*, 164 Wis. 2d 499, 476 N.W.2d 280 (Ct. App. 1991). Further, lead, like the carbon dioxide in *Donaldson*, is a common substance which is present as a harmless ingredient in ordinary items such as lead crystal.[6]

¶ 113. Cases from other jurisdictions are all over the board on the issue of whether lead in paint unambiguously fits the pollution exclusion clause's definition of "pollutant." While some courts agree with the major-

---

[6] Without citation, the majority makes a statement to the effect that a substance which is a "pollutant" in one scenario must be a "pollutant" in every scenario, regardless of whether it is incorporated into another material. *See* majority op. at 130 n.16. As I explained previously in the text and footnote 3, such a sweeping reading of the pollution exclusion clause is wholly contrary to our holding in *Donaldson*.

Moreover, it is unclear how the majority reconciles its "once a pollutant, always a pollutant" rule with its reliance earlier in its opinion on *United States Fire Insurance Co. v. Ace Baking Co.*, 164 Wis. 2d 499, 476 N.W.2d 280 (Ct. App. 1991), and *Vance v. Sukup*, 207 Wis. 2d 578, 558 N.W.2d 683 (Ct. App. 1996), *vacated*, 211 Wis. 2d 529, 568 N.W.2d 297 (1997). The majority points out that in *Ace Baking*, the court of appeals noted that the chemical linalool was a "valued ingredient for some uses" even though it was a "pollutant" in the particular factual setting of the case. Majority op. at 128 (quoting *Ace Baking*, 164 Wis. 2d at 505). The majority quotes the *Ace Baking* court as stating that "it is a rare substance indeed that is *always* a pollutant; the most noxious of materials have their appropriate and non-polluting uses." Majority op. at 128 (quoting *Ace Baking*, 164 Wis. 2d at 505). The majority also quotes the following passage from *Vance*: "As we noted in *Ace Baking*, a substance's status as either a valued ingredient or a contaminant depends on where it is. . . ." Majority op. at 129 (quoting *Vance*, 207 Wis. 2d at 583–84).

ity that lead is universally considered to be a pollutant,[7] cases from other courts (including several state supreme courts) reach the opposite conclusion.[8] Moreover, some of the cases cited by the majority in support of its position must be discarded by this court as contrary to our holding in *Donaldson* that the scope of the clause, despite its broad wording, must be "circumscribed by reasonableness." *Donaldson*, 211 Wis. 2d at 233. *See Shalimar Contractors, Inc. v. American States Ins. Co.*, 975 F. Supp. 1450, 1457 (M.D. Ala. 1997); *St. Leger v. American Fire and Cas. Ins. Co.*, 870 F. Supp. 641, 643 (E.D. Pa. 1994). In any event, "the range and variety of judicial opinions bolsters the conclusion that the pollution exclusion here is ambiguous." *Lefrak Org., Inc. v. Chubb Custom Ins. Co.*, 942 F. Supp. 949, 957 (S.D.N.Y. 1996). *See also Sullins v. Allstate Ins. Co.*, 667 A.2d 617, 624 (Md. 1995).

¶ 114. It must also be kept in mind that a reasonable insured would expect coverage that is consistent

[7] *See, e.g., St. Leger v. American Fire and Casualty Insurance Co.*, 870 F. Supp. 641, 643 (E.D. Pa. 1994); *Shalimar Contractors, Inc. v. American States Ins. Co.*, 975 F. Supp. 1450, 1457 (M.D. Ala. 1997); *Auto-Owners Ins. Co. v. Hanson*, 588 N.W.2d 777, 779 (Minn. Ct. App. 1999); *Oates*, 597 N.Y.S.2d at 554.

[8] Several state supreme courts have held that lead in paint does *not* fit unambiguously within the definition of "pollutant" in the pollution exclusion clause. *See, e.g., Atlantic Mutual Ins. Co. v. McFadden*, 595 N.E.2d 762, 764 (Mass. 1992); *Sullins v. Allstate Ins. Co.*, 667 A.2d 617, 620 (Md. 1995); *Weaver v. Royal Ins. Co. of Am.*, 674 A.2d 975, 977–78 (N.H. 1996).

Other courts agree. *See, e.g., Sphere Drake Ins. Co. v. Y.L. Realty Co.*, 990 F.Supp. 240, 244–45 (S.D.N.Y. 1997); *Danbury Ins. Co.*, 727 A.2d at 283; *Insurance Co. of Ill. v. Stringfield*, 685 N.E.2d 980, 984 (Ill. App. Ct. 1997); *Generali-U.S. Branch v. Caribe Realty Corp.*, 612 N.Y.S.2d 296, 299 (N.Y. Sup. Ct. 1994).

with the purpose of the insurance policy provided. *See General Cas.*, 209 Wis. 2d at 183. This case involves a comprehensive general liability (CGL) policy. "The CGL policy was designed to protect an insured against liability for negligent acts resulting in damage to third parties." *Id.* at 183–84 (quoting Arnold P. Anderson, *Wisconsin Insurance Law* § 5.14, at 136 (3d ed. 1990 & Supp. 1997)). In accordance with this purpose, a reasonable landlord would expect coverage for his or her negligent failure to remove lead paint if the lead later resulted in injury to other persons, such as Kevin Peace.

¶ 115. The majority also provides a lengthy recitation of the history of the pollution exclusion clause, concluding that it does not support the conclusion that the terms "discharge," "dispersal," "release," and "escape" in the clause are terms of art in environmental law. *See* majority op. at 139–44. Because I find that the first condition required for the pollution exclusion clause to apply is not met in this case, I need not discuss the second condition (whether there was a "discharge, dispersal, etc." under the terms of the policy). *See Donaldson*, 211 Wis. 2d at 233 n.6. It is significant, however, that several courts have concluded that the pollution exclusion clause *is* aimed at dealing with industrial and environmental pollution.[9]

---

[9] Significantly, our court of appeals is among these courts:

> The history of the CGL pollution exclusion clause shows that the insurance industry was concerned about liability if faced from environmental accidents such as oil spills and under federal environmental legislation. Nowhere in his history is there any suggestion that the pollution exclusion clause was intended to exclude more than coverage for liability for environmental damage.

*Beahm v. Pautsch*, 180 Wis. 2d 574, 584, 510 N.W.2d 702 (Ct. App. 1993).

*See, e.g., Sphere Drake Ins. Co. v. Y.L. Realty Co.*, 990 F. Supp. 240, 244 (S.D.N.Y. 1997); *Sullins*, 667 A.2d at 622–23; *Generali-U.S. Branch v. Caribe Realty Corp.*, 612 N.Y.S.2d 296, 298–99 (N.Y. Sup. Ct. 1994); *West Am. Ins. Co.*, 409 S.E.2d at 699. Pointing out that no language has ever been added to the clause to specifically address lead or lead-based paint, these courts have concluded that amendments to the clause have failed to include lead or lead-based paint unambiguously in the definition of "pollutant," and thus, have not altered the historical purpose of the clause to exclude environmental and industrial pollution. *See Sphere Drake*, 990 F.2d at 243–44; *Generali*, 612 N.Y.S.2d at 299; *West Am. Ins. Co.*, 409 S.E.2d at 699.

¶ 116. For these reasons, and consistent with *Donaldson*, I agree with the many courts which hold that while the broad language of the policy might suggest that lead in paint is a "pollutant," a reasonable insured could understand "pollutant" as *not* including lead in paint. Consequently, I agree with the many courts which hold that lead in paint is not unambiguously included within the definition of "pollutant" in the pollution exclusion clause.

¶ 117. A cardinal rule of insurance policy interpretation is that "ambiguities in a policy's terms are to be resolved in favor of coverage, while coverage exclusion clauses are narrowly construed against the insurer." *See Donaldson*, 211 Wis. 2d at 230 (citing *Smith v. Atlantic Mut. Ins. Co.*, 155 Wis. 2d 808, 811, 456 N.W.2d 597 (1990)). Because I conclude that the pollution exclusion clause is ambiguous as to whether lead in paint is a "pollutant," these principles require that I construe the clause in this case against North-

western.[10] Consequently, I must conclude that lead in paint is not a "pollutant" under the policy, such that the pollution exclusion clause does not preclude coverage for Peace's injuries.

¶ 118. As I have already explained, this case arises in the context of the duty to defend. Therefore, if there is *any* possibility that Peace's claims would, if proved, result in liability under the terms of the policy, this court is required to hold that Northwestern has a duty to defend the suit. Based on the ambiguity of the pollution exclusion clause, I conclude that such a possibility exists. Summary judgment to Northwestern on the duty to defend issue was improper in this case.

¶ 119. In conclusion, I point out that the position of the majority denies an effective remedy, in many instances, to children like Kevin Peace who have suffered injuries as a result of lead in paint. The majority cites numerous articles and statistics regarding the vulnerability of children to lead poisoning and the tragic consequences which can result. *See* majority op. at 111 n.2, 123–24 n.12, 123–25, 125 n.13, 137–38 nn.18–19, 144–45. The majority's parade of horribles underscores the importance of the availability of insurance coverage for collection of damages by children

---

[10] In *Donaldson*, we explained the purpose of the rule that ambiguous language in insurance policies is construed against the insurer: "The principle underlying the doctrine is straightforward. As the drafter of the insurance policy, an insurer has the opportunity to employ expressive exactitude in order to avoid a misunderstanding of the policy's terms." *Donaldson*, 211 Wis. 2d at 230. The number of cases on the subject (see footnotes 7 and 8) provided Northwestern with ample notice that lead in paint might not be unambiguously included in its pollution exclusion clause. If Northwestern had wished to avoid its duty to defend this case, it could have redrafted the clause.

injured in lead paint-related incidents. The logic inherent in the majority's decision to deny insurance coverage to landlords alleged to be negligent in such circumstances is difficult to understand in light of the majority's recognition of the seriousness of the problem.

¶ 120. I cannot join the majority's apparent assault on child victims of lead poisoning. In short, I find the majority's decision to be inconsistent with the rules for analyzing whether an insurer has a duty to defend, inconsistent with this court's two-year-old decision in *Donaldson*, and inconsistent with the well-settled principle that insurance policies are to be interpreted from the perspective of the reasonable insured. I would affirm the court of appeals' decision, and therefore, I respectfully dissent.

¶ 121. I am authorized to state that Justice WILLIAM A. BABLITCH joins this dissent.