**Jacqueline HEJSAK, Plaintiff,**

v.

**GREAT–WEST LIFE & ANNUITY INSURANCE COMPANY, Defendant.**

No. 03–C–629–C.

United States District Court, W.D. Wisconsin.

Aug. 17, 2004.

Howard J. Eglash, for Plaintiff.

J. Manuel Raneda, Gonzalez, Saggio & Harlan, L.L.P., Milwaukee, WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

In this civil action for monetary relief, plaintiff Jacqueline Hejsak asserts breach of contract and bad faith claims against defendant Great–West Life & Annuity Insurance Company for denying her benefits under a life insurance policy issued to her husband, Robert Hejsak. Jurisdiction is present. 28 U.S.C. § 1332.

Presently before the court are the parties' cross motions for summary judgment, plaintiff's motion to supplement the affidavits of two experts and defendant's motion for leave to reply to plaintiff's additions to the record. I conclude that because defendant has not shown that Robert Hejsak knew or should have known that he suffered from a "central nervous system disorder" or "liver disease" as defined in the policy, defendant did not have authority to rescind the policy under Wis. Stat. § 631.11(1)(b). Therefore, I will deny defendant's motion for summary judgment and grant plaintiff's motion as to the breach of contract claim. However, plaintiff has not met her burden to show that it was unreasonable for defendant to believe that Robert Hejsak knew or should have known that he suffered from a "central nervous system disorder" affecting his spinal cord. For this reason, I will deny plaintiff's motion for summary judgment on her claim of bad faith and grant defendant's motion on that claim. Finally, because I did not consider plaintiff's additional documents in reaching a decision in this case, I will deny as unnecessary plaintiff's motion to supplement her affidavits and defendant's motion for leave to reply to plaintiff's additional documents.

From the parties' proposed findings of fact and the record, I find the following facts to be material and undisputed.

## UNDISPUTED FACTS

Plaintiff Jacqueline Hejsak is a citizen of Wisconsin. She is the widow of Robert J. Hejsak. Defendant Great–West Life & Annuity Insurance Company is a citizen of the state of Colorado. It provides life insurance products to its customers.

On October 18, 1999, in response to unsolicited mail from U.S. Bank offering life insurance through defendant, Robert Hejsak applied for a life insurance policy with defendant, requesting coverage of $150,000. Plaintiff filled out a similar application for life insurance.

In his application for life insurance with defendant, Robert Hejsak answered "No" to all of the medical questions, including the following:

As of the date you sign this application and within the last 10 years has a medi-

cal professional diagnosed you as having or treated you for:

1. Any of the following diseases or disorders: (check all that apply):

☐ heart disease or disorder

☐ liver disease or Hepatitis (other than type A)

.   .   .   .   .

2. Stroke, paralysis, brain or central nervous system disorders, multiple sclerosis or epilepsy?

Defendant has internal practices and procedures that state that among the "qualifications" it requires of applicants before it issues a policy is a "No" answer to all the medical questions on the application. Defendant's internal procedures list the medical questions on the application and also list "spinal cord" as part of the question asking whether the applicant has been diagnosed with or treated for "[s]troke, paralysis, brain, *spinal cord* or central nervous system disorders, multiple sclerosis or epilepsy" (emphasis added). Sometime after Robert Hejsak signed defendant's life insurance application, defendant revised its application to include the term "spinal cord" in the question so that the application now reads "[s]troke, paralysis, brain, spinal cord or central nervous system disorders, multiple sclerosis or epilepsy."

On October 27, 1999, defendant issued life insurance policy no. 87520645 to Robert Hejsak on the basis of the application that he signed on October 18. Defendant would not have issued the policy to him if he had answered "Yes" to any of the medical questions on the application. The policy states that it will "not be contested on the basis of misrepresentation after it has been in force during the Insured's lifetime for 2 years from the Issue Date." In addition, the "Death Benefit Provisions" section of the policy states that defendant "will pay interest on the Proceeds from the date of death to the date of settlement at a rate not less than required by law."

Plaintiff is intimately familiar with Robert Hejsak's medical history for the ten years preceding October 18, 1999 because she attended many of his visits to his doctor, spoke regularly with his physicians and was present when his physicians spoke to him. No medical professional ever told Robert Hejsak in the presence of plaintiff that he had been diagnosed or treated for a central nervous system disorder, a heart disease or disorder or a liver disease. In addition, Robert Hejsak never told plaintiff or anyone else in plaintiff's presence that he believed that he had been diagnosed as having been treated for a central nervous system disorder, a heart disease or disorder or a liver disease.

Robert Hejsak died on March 12, 2001 as a result of multiple gunshot wounds. On May 1, 2001, plaintiff applied to defendant for the benefits of the policy. Because Robert Hejsak died within two years of issuance of the policy, defendant investigated Robert Hejsak's medical history by reviewing some of his medical records for the ten years prior to his death. Robert Hejsak's medical records revealed the following information about him:

a. On January 23, 1997, he was involved in a motor vehicle accident.

b. Michael F. Gonzales, M.D. and Marshall E. Pederson, M.D. were two physicians who treated him at various times after the accident.

c. According to a letter by Gonzales dated July 8, 1999, Hejsak was "physically disabled by spinal damage at multiple levels," required "ongoing and regularly scheduled medical care for multiple medical problems," expected to require additional spinal surgery" and was "suffering from liver damage and urologic damage all of which require regular medical and surgical care."

d. As early as August 12, 1997, Pederson discussed with him at length his spinal condition and told him that "the automobile accident certainly has caused a strain of the cervical, thoracic and lumbar spine."

e. A handwritten note from Gonzales dated August 20, 1997 reads "*DIAGNOSES* 1) Thoracic Disc Herniation, 2) Cervical Disk Herniation, 3) Sacroiliac and Lumbosacral Strain."

f. In another handwritten note to a pharmacist dated August 9, 1999, Gonzales stated that Robert Hejsak "has cervical spinal stenosis, sacroiliac displacement and has also been given the diagnosis of 'stiff-man syndrome' . . . He is also being monitored for hepatic, renal or hematologic side effects of his condition."

g. In a letter dated June 4, 1998, Gonzalez wrote that Hejsak suffered from "cervical and thoracic disc protrusions and sacroiliac joint displacement," that he was totally disabled by the 1997 accident injury and that his condition was permanent. In addition, Gonzales wrote that Hejsak will continue to require medical care "including treatment of the urologic problems he experienced secondary to his spinal injury."

h. On October 13, 1999, Hejsak was seen at the emergency room where an "abnormal" ECG "showed inf wall MI," which immediately required him to be referred to the cardiology department of Loyola University Medical Center for evaluation."

Sue Beardshear, defendant's chief underwriter responsible for reviewing the Hejsak claim, completed a death claims review worksheet. After the first review of the Hejsak case, Beardshear believed that there were two bases on which to deny coverage: the central nervous system disorder and the existence of a heart disease or disorder. However, upon reviewing additional medical records, Beardshear determined that Hejsak may have answered the "heart disease or disorder" question on the life insurance application correctly, as his follow-up cardiology tests were negative. Beardshear did not believe that Hejsak's records contained a strong enough indication that he would have been informed that he had liver disease.

As a result of a review of Hejsak's medical records, defendant determined that Hejsak should have answered "Yes" to the "central nervous system disorders" question on the application. (The parties dispute whether defendant determined that Hejsak should have answered "Yes" to the "heart disease or disorder" medical question.) However, while reviewing Hejsak's medical records, defendant's medical consultant, Dr. Richard Capek, never saw the term "a central nervous system disorder" in any of Hejsak's records. Allen P. Ingenito, M.D., a neurologist hired by defendant, reviewed Robert Hejsak's medical records and concluded to a reasonable degree of medical certainty that at the time Hejsak applied to defendant for life insurance, Hejsak was diagnosed with or treated for a "central nervous system disorder" and "liver disease."

Defendant denied plaintiff's claim for benefits under the policy, writing to plaintiff in an April 25, 2002 letter:

Thank you for your letter of April 4, 2002. As previously advised, Policy 87520645 was within the two year contestable period at the time of death of Robert Hejsak and that a routine investigation would be conducted. If our investigation reveals that any of the questions on the application were not answered truthfully, regardless of the cause of death, we can exercise our right during the first two years only to rescind the policy.

A copy of the application is enclosed. On the application—MEDICAL INFORMATION—the application states "as of the date of this application and within the past 10 years has a medical professional diagnosed you as having or treated you for:" followed by the five medical questions—all of which were answered "NO".

Our primary reason for denial of the claim would be in regards to Question 2—brain or central nervous system disorders—the nervous system being defined as the brain, brain stem and spinal cord. Due to a motor vehicle accident in January 1997, Mr. Hejsak suffered severe and disabling injuries to his spine with evidence of engagement of the spinal cord causing extreme pain and other symptomology (fasciculation, dysphagia and axial muscle stiffness associated with spinal cord involvement). It is also documented by Dr. Marshall Pederson (neurosurgeon) that the condition was discussed thoroughly with Mr. Hejsak. Had we been advised of this information on the application, we would not have issued the policy.

Mrs. Hejsak, if you have additional information that would dispute the medical information provided by Dr. Marshall Pederson, please forward it to our office.

Neal Taylor, a board certified physical medicine and rehabilitation physician, reviewed Robert Hejsak's medical records and reports made available to him by plaintiff's counsel for the ten years prior to October 18, 1999. To a reasonable degree of medical certainty, Taylor concluded the following:

a. Based upon my review of the aforementioned medical records, I concur with the conclusion reached by Dr. Gonzales in his August 29, 2001 correspondence, to wit, that within the ten years preceding the signing of the Great-West Life Insurance Application ... no medical professional had diagnosed Mr. Hejsak as having or treated him for heart disease or disorder, or brain or central nervous system disorders.

b. That the undersigned also reviewed Dr. Allan Phillip Ingenito's Affidavit and Report of June 6, 2004 ... That the undersigned respectfully disagrees with the conclusions of Dr. Ingenito on the issues of Central Nervous System Disorder per the above. Additionally, Dr. Ingenito's conclusion [that] Mr. Hejsak was diagnosed as having or treated for a liver disease is incorrect, in that Mr. Hejsak's liver function was monitored due to the type and amount of medication he was taking, but he certainly was never diagnosed as having or was ever treated for a liver disease.

c. Thus, after reviewing the decedent's medical records, there is no evidence that Mr. Hejsak knew or should have known that a medical professional diagnosed him as having or treated him for a central nervous system disorder, liver disease, or heart disease or disorder.

Plaintiff filed a lawsuit against defendant on October 1, 2003, in the Circuit Court for LaCrosse County, Wisconsin. Defendant removed the case to this court on November 6, 2003.

## OPINION

### A. *Misrepresentation*

The initial question is whether Robert Hejsak misrepresented his medical condition on the application form when he checked "No" in answer to the question whether in the past ten years he had been diagnosed with or treated for a "central nervous system disorder" and "liver disease." (At various points in its brief defendant appears to argue that Hejsak knew or should have known that he had

been diagnosed with or treated for a "heart disease or disorder." However, defendant points to no evidence that suggests why Hejsak knew or should have known he had a heart disease or disorder. Rather, defendant focuses on evidence relating to a central nervous system disorder and liver disease. Because defendant has not supported its argument relating to Hejsak's cardiac condition, that argument is deemed waived. *Central States, Southeast and Southwest Areas Pension Fund,* 181 F.3d 799, 808 (7th Cir.1999) ("Arguments not developed in any meaningful way are waived."). As a result, I will assume that the parties dispute only the "central nervous system disorder" and "liver disease" question.)

### 1. *Central nervous system disorder*

According to defendant, a spinal cord injury qualifies as a "central nervous system disorder" and Hejsak knew or should have known that he suffered from such a disorder because he had injured his spine in the 1997 auto accident that left him disabled and required him to seek ongoing medical treatment for that injury. Thus, defendant believes Hejsak should have recognized his spinal cord injury as a central nervous system disorder by answering "Yes" to the relevant question on the application and that when he failed to do so, the insurance policy became void. Plaintiff disagrees and asserts that the policy language concerning "central nervous system disorder" is ambiguous.

█ Because the policy involved in this suit was issued in Wisconsin, Wisconsin law governs. *Lexington Insurance Company v. Rugg & Knopp, Inc.,* 165 F.3d 1087, 1090 (7th Cir.1999); *Kremers–Urban Co. v. American Employers Ins. Co.,* 119 Wis.2d 722, 351 N.W.2d 156 (1984). Wis. Stat. § 631.11(1)(b) sets forth the conditions under which an insurer may rescind

a policy on the basis of a misrepresentation by the insured:

**Misrepresentation or breach of affirmative warranty.** No misrepresentation, and no breach of an affirmative warranty, that is made by a person other than the insurer or an agent of the insurer in the negotiation for or procurement of an insurance contract constitutes grounds for rescission of, or affects the insurer's obligations under, the policy unless, if a misrepresentation, the person knew or should have known that the representation was false, and unless any of the following applies:

1. The insurer relies on the misrepresentation or affirmative warranty and the misrepresentation or affirmative warranty is either material or made with intent to deceive.

2. The fact misrepresented or falsely warranted contributes to the loss.

Thus, under the statute, even if I assume that medically, a spinal cord injury qualifies as a "central nervous system disorder" and that a negative response to the relevant question on defendant's application amounts to a misrepresentation, defendant still must show that Hejsak knew or should have known that he had been diagnosed with or treated for a "central nervous system disorder." (This may be a generous assumption, however, given that Ingenito and Taylor reached different conclusions regarding whether plaintiff's spinal cord injury qualified as a central nervous system disorder.) Plaintiff argues that Hejsak neither knew nor should have known that he had been diagnosed with or treated for a central nervous system disorder. Furthermore, plaintiff contends that the term "central nervous system disorder" is ambiguous and therefore defendant could not have expected Hejsak to recognize his back injury as a central nervous system disorder. (I note that neither par-

ty addresses subsection (2) of Wis. Stat. § 631.11(1)(b), which states that an insurer may not rescind an insurance contract unless the fact misrepresented "contributes to the loss," particularly when it is undisputed that Hejsak died from causes unrelated to his back injury. However, because plaintiffs do not raise the argument, I will not address it.)

■ It is undisputed that no medical professional ever told Hejsak in the presence of plaintiff that he had been diagnosed with or treated for a central nervous system disorder and that Hejsak never told plaintiff or anyone else in plaintiff's presence that he believed he had been diagnosed as having or had been treated for a central nervous system disorder. It is undisputed also that defendant's medical consultant, Richard Capek, never saw the term "a central nervous system disorder" in any of Hejsak's medical records. Although these facts support an inference that Hejsak did not know that he had a central nervous system disorder, they do not carry the day for plaintiff. Just because the exact words in the application do not appear in Hejsak's medical records does not mean that he did not have a duty to try to understand the question defendant asked of him. *Southard v. Occidental Life Insurance Co. of California,* 31 Wis.2d 351, 357, 142 N.W.2d 844, 847 (1966) (applicant must make reasonable use of his faculties in endeavoring to understand and answer questions asked of him and answers must be made fairly and in good faith). Certainly a little research would have led Hejsak to the discovery that "central nervous system" included the spinal cord. However, it may have been more difficult for Hejsak to understand the meaning of "central nervous system *disorder,*" as those words may mean different things to different people. Therefore, plaintiff's argument that defendant's policy language is ambiguous is much more significant than the absence of the words "central nervous system disorder" in Hejsak's medical records.

■ The construction of an insurance contract is a question of law, and thus properly decided on a motion for summary judgment. *Kennedy v. Washington National Ins. Co.,* 136 Wis.2d 425, 428, 401 N.W.2d 842, 844 (Ct.App.1987). Interpretation of the language of an insurance policy is governed by the same rules of construction that govern other contracts, *Peace ex rel. Lerner v. Northwestern National Ins. Co.,* 228 Wis.2d 106, 120, 596 N.W.2d 429, 435 (1999) (citing *Weimer v. Country Mutual Ins. Co.,* 216 Wis.2d 705, 721, 575 N.W.2d 466, 472 (1998)), which means that the primary objective of interpretation is to ascertain and carry out the intentions of the parties. *General Casualty Co. of Wisconsin v. Hills,* 209 Wis.2d 167, 175, 561 N.W.2d 718, 722 (1997).

■ Courts are to interpret the language of an insurance policy according to its plain and ordinary meaning as understood by a reasonable person in the position of the insured. *Kremers–Urban Company v. American Employers Insurance,* 119 Wis.2d 722, 735, 351 N.W.2d 156, 163 (1984). If the language is ambiguous, that is, if it is fairly susceptible to more than one reasonable interpretation when read in context, *Peace ex rel. Lerner,* 228 Wis.2d at 154, 596 N.W.2d at 450, courts must construe the policy in favor of coverage and construe the exclusions narrowly against the insurer. *Smith v. Atlantic Mutual Ins. Co.,* 155 Wis.2d 808, 811, 456 N.W.2d 597, 598 (1990). Whether an ambiguity exists in an exclusion from coverage depends on the meaning that the words used to describe the exclusion would have to a reasonable person of ordinary intelligence in the position of the insured. *Kozak v. United States Fidelity & Guaranty Co.,* 120 Wis.2d 462, 467, 355 N.W.2d 362, 364 (Ct.App.1984). However, this

**764**

principle does not allow a court to eviscerate an exclusion that is clear from the face of the insurance policy. *Whirlpool Corp. v. Ziebert*, 197 Wis.2d 144, 152, 539 N.W.2d 883, 886 (1995). When no ambiguity exists, a court will not engage in construction but will merely apply the policy terms, *Kremers–Urban Company*, 119 Wis.2d at 736, 351 N.W.2d at 163, so as "to avoid rewriting the contract by construction and imposing contract obligations that the parties did not undertake." *Danbeck v. American Family Mutual Insurance Co.*, 245 Wis.2d 186, 193, 629 N.W.2d 150, 154 (2001).

■ Defendant argues that the term "central nervous system disorder" is not ambiguous and that the numerous surgeries and treatments Hejsak underwent because of his spinal cord injury should have induced him to disclose his back condition by answering "Yes" to the "central nervous system disorder" question. Furthermore, defendant contends that requiring an insurance company to define all medical terminology in an application so that any layperson can understand those terms would force insurers to include a medical dictionary with every application, as defining one term may lead to other medical terms that need definition. Plaintiff points out that the "central nervous system disorder" question is surrounded by other medical conditions of stroke, paralysis, brain disorders, multiple sclerosis and epilepsy. Thus, according to plaintiff, the application question may "fetch the answer" of Parkinson's disease but not back injuries.

Plaintiff's argument is persuasive. Under *Southard*, 31 Wis.2d at 357, 142 N.W.2d at 847, the Supreme Court of Wisconsin held that the life insurance applicant did not have a "serious illness" by employing "the familiar canon of construction of 'ejusdem generis.'" The insurance application asked whether the Southard had "heart disease, diabetes, lung disease, cancer or any other serious illness, or received treatment or medication for blood pressure?" *Id.* The court concluded that these diseases were related to and seriously affected the general soundness and health of a person and required continuous medical treatment and that Southard's condition of quadriplegia was not of the same category of the listed conditions. *Id.*

Similarly, the "central nervous system disorder" question on defendant's application is surrounded by specific health conditions. Although "central nervous system" includes the spinal cord, *see e.g.*, *Webster's New World College Dictionary* (4th ed.2001) (defining "central nervous system" as the brain and spinal cord of a vertebrate), it is unclear whether a layperson such as Hejsak would classify a back injury, which according to Hejsak's medical records consisted of "cervical and thoracic disc protrusions and sacroiliac joint displacement," as a "disorder" in the same category as stroke, paralysis, multiple sclerosis or epilepsy. "An insurer soliciting by mail applications for life insurance from laymen cannot expect medical opinions as answers to inquiries ... Nor can an insurer inquire about a few illnesses and expect a complete medical history in response." *Southard*, 31 Wis.2d at 357, 142 N.W.2d at 847. *Webster's New World College Dictionary* (4th ed.2001) defines "disorder" as "an upset of normal function; ailment." *Webster's New World College Dictionary* (4th ed.2001) defines "ailment" as "any bodily or mental disorder; illness, especially a mild, chronic one." Thus, one reasonable interpretation of the term "disorder" is "illness" only. With the exception of "paralysis," reading the list of conditions in the "central nervous system disorder" question may lead one to conclude that the question was aiming for central nervous system illnesses, not injuries. Hejsak suffered from a back or spinal cord *injury*. *Webster's New World*

*College Dictionary* (4th ed.2001) defines "injury" as "physical harm or damage to a person."

Although dictionary definitions "can shed only partial light on the reasonable understanding of an insured with regard to words in the context of a particular insurance policy," *Sprangers v. Greatway Insurance Co.*, 182 Wis.2d 521, 537, 514 N.W.2d 1, 7 (1994), the distinction between the definitions of "disorder" and "injury" in combination with the list of conditions such as stroke, epilepsy and multiple sclerosis in the central nervous system disorder question may lead a reasonable person to conclude that a back or spinal injury does not qualify as a "central nervous system disorder." The application filled out by Hejsak did not ask him whether he suffered from spinal cord damage in general. In fact, defendant did not change its application to include the phrase "spinal cord" in the central nervous system disorder question until after Hejsak filled out his application.

Moreover, Hejsak's back injury was caused by a car accident that left him physically disabled by spinal damage at multiple levels. He may not have viewed the cause of his disability as in the same category as disabilities caused by stroke, multiple sclerosis or epilepsy, which typically do not occur as the result of a car accident. Even if a reasonable person interpreted "disorder" to include injuries and not just illnesses, that person could have interpreted the "central nervous system disorder" question as excluding injuries to the spinal cord that are less severe than paralysis, for example. Furthermore, defendant's expert, Ingenito, merely concludes that Hejsak's spinal condition met the definition of "central nervous system disorder" without specifying why it met that definition. Without a clear definition of the meaning of "central nervous system disorder," it is unreasonable for defendant

to expect a layperson such as Hejsak to assume his back injury qualified as such a disorder. The evidence does not support an inference that Hejsak knew or should have known that answering "No" to defendant's central nervous system disorder question was a misrepresentation.

### 2. *Liver disease*

■ Defendant argues that Hejsak knowingly misrepresented his application for life insurance when he answered "No" to the question "As of the date you sign this application and within the past 10 years has a medical professional diagnosed you as having or treated you for: liver disease or Hepatitis (other than type A)?" Defendant makes this argument on the basis of Ingenito's conclusion that at the time Hejsak applied for a life insurance policy with defendant, Hejsak had been diagnosed with or treated for a "liver disease." However, it is undisputed that defendant's chief underwriter, Beardshear, did not believe Hejsak's medical records indicated that he would have been informed that he had liver disease. Furthermore, Hejsak's physician, Gonzales, stated that Hejsak was "suffering from liver *damage*" (emphasis added). According to *Webster's New World College Dictionary* (4th ed.2001), "disease" is defined as "a particularly destructive *process* in an organ or organism, with a specific cause and characteristic symptoms" (emphasis added). "Damage," on the other hand, is defined as "injury or harm to a person or thing, resulting in a loss in soundness or value." *Webster's New World College Dictionary* (4th ed.2001). Thus, "disease" implies a condition that is ongoing, whereas "damage" implies a one-time occurrence that leaves a permanent loss.

Coupling the distinction between the terms "disease" and "damage" with Beardshear's conclusion that Hejsak's records did not indicate that he would have

known that he had a liver disease suggests that it was reasonable for him to answer "No" to the liver disease question. It is undisputed that Hejsak never told plaintiff or anyone else in plaintiff's presence that he believed that he had been diagnosed as having or had been treated for a liver disease. Under the doctrine of contra proferentem ("against the offeror"), "the policy's terms should be interpreted *as they would be understood from the perspective of a reasonable person in the position of the insured.*" *State Farm Mutual Automobile Insurance Co. v. Langridge,* 683 N.W.2d 75, 86–87 (Wis.2004). Furthermore, if defendant's chief underwriter assigned to Hejsak's case does not believe that Hejsak would have known that he had a "liver disease," then it is reasonable to expect that Hejsak as the insured would not have known that he had such a disease. The opinion of defendant's chief underwriter supports the conclusion that a reasonable person could conclude Hejsak's liver damage is different from "a liver disease." Even if I assume that defendant's expert, Ingenito, is correct and that from a medical standpoint, Hejsak's condition is encompassed in the "liver disease" question, defendant has not shown that Hejsak, as a layperson, knew or should have known that he had been diagnosed with or treated for a liver disease. *Southard,* 31 Wis.2d at 357, 142 N.W.2d at 847 (inquiry in life insurance application called for layman's answer, not medical opinion).

Because defendant has not shown that Hejsak knew or should have known that he suffered from a "central nervous system disorder" or "liver disease" as defined in the context of the policy, defendant does not have authority to rescind the policy under Wis. Stat. § 631.11(1)(b). As a result, I will deny defendant's motion for summary judgment and grant plaintiff's motion as to the breach of contract claim. Because Hejsak's policy is not void, defendant must pay plaintiff $150,000 plus interest as required under life insurance policy # 87520645.

### B. *Bad Faith*

To prevail on a claim of bad faith in the insurance context, an insured must establish that (1) there was no reasonable basis for denying the claim under an objective standard and (2) the insurer acted with knowledge or reckless disregard for the lack of a reasonable basis. *Anderson v. Continental Ins. Co.,* 85 Wis.2d 675, 692, 271 N.W.2d 368, 377 (1978). In determining whether there is evidence of a reasonable basis for denying a claim, it is relevant to examine whether a claim was investigated appropriately and whether the results of the investigation were evaluated and reviewed reasonably. *Id.* If an insured's claim is "fairly debatable" either in fact or law, an insurer cannot be said to have denied the claim in bad faith. *Id.* at 691, 271 N.W.2d at 377.

Plaintiff contends that defendant acted in bad faith in the investigation and handling of plaintiff's claim because it is undisputed that Beardshear determined that Hejsak may have answered the "heart disease or disorder" question correctly on the life insurance application, that she did not believe that Hejsak's records contained a strong enough indication that he would have been informed that he had liver disease and that defendant's medical consultant, Dr. Richard Capek, never saw the term "a central nervous system disorder" in any of Hejsak's records. Despite these facts that plaintiff asserts, defendant continues to deny her claim for benefits. Therefore, defendant has no reasonable basis to deny plaintiff's claim.

To avoid a bad faith claim, defendant needs only one reasonable basis on which to deny benefits. Defendant argues that at the very least the discussion of spinal damage in Hejsak's medical records suggests that it had a reasonable basis on which to deny plaintiff's claim for benefits.

I agree. Although a reasonable person may not view his back injury as a "central nervous system disorder" in the context of the question as written on Hejsak's application, another reasonable person working for the insurer might view it as such. *See e.g., American Casualty Co. v. B. Cianciolo, Inc.*, 987 F.2d 1302, 1306 (7th Cir. 1993) (under Wisconsin law, *insurer* that has fairly debatable basis for denying claim does not exhibit bad faith in doing so) (emphasis added).

It is undisputed that defendant's policy did not prohibit it from reviewing Hejsak's medical records for misrepresentation because the policy had been in force less than two years before Hejsak died. After the first review of the Hejsak case, Beardshear believed that there were two bases on which to deny coverage: the central nervous system disorder and the existence of a heart disease or disorder. After further review of Hejsak's medical records, Beardshear changed her mind about his answer to the "heart disease or disorder" question. However, plaintiff has adduced no evidence showing that Beardshear changed her mind about Hejsak's answer to the central nervous system disorder question. In the April 25, 2002 letter to plaintiff denying benefits, defendant mentions only Hejsak's response to the central nervous system disorder question. It is undisputed that defendant's internal procedures include the phrase "spinal cord" as part of the question asking whether the applicant has been diagnosed with or treated for "[s]troke, paralysis, brain, *spinal cord* or central nervous system disorders, multiple sclerosis or epilepsy" (emphasis added). Furthermore, Hejsak's medical records contained several references to Hejsak's spinal cord, such as Hejsak was "physically disabled by *spinal* damage at multiple levels," that *Pederson discussed with him at length* his *spinal condition* and told him that "the automobile accident certain-ly has caused a strain of the cervical, thoracic and lumbar *spine*" and that he had cervical *spinal* stenosis and sacroiliac displacement (emphasis added).

Thus, the undisputed facts show that it was reasonable for defendant to believe that Hejsak knew or should have known that he suffered from a "central nervous system disorder" affecting his spinal cord. Plaintiff has not met her burden to show that defendant acted in bad faith. *Anderson*, 85 Wis.2d at 692, 271 N.W.2d at 377 (*insured* must establish that there was no reasonable basis for denying the claim under objective standard) (emphasis added). Therefore, I will deny plaintiff's motion for summary judgment and grant defendant's motion as to plaintiff's bad faith claim.

### C. Motions to Supplement Affidavits and Reply to Documents

Plaintiff moves the court under Fed. R.Civ.P. 56(e) to allow her to supplement the affidavits of Neal Taylor, M.D. and Marshall Reavis and submits an addendum to her brief in support of her motion for summary judgment. The purpose of the supplemental affidavits is to correct typographical errors in Reavis's report and to clarify records that Taylor reviewed in prior to preparing his earlier affidavit and reports. The purpose of the addendum is to draw the court's attention to an unpublished case similar to plaintiff's from the Eastern Division of the United States District Court for the Northern District of Mississippi. Defendant objects to these additions to the record and requests to court for leave to reply to them. Plaintiff's request to supplement her affidavits has no effect on the decision of this case. In addition, plaintiff's addendum holds no precedential value in this court because the case that she wishes this court to consider is unpublished and from a district court outside the Seventh Circuit. Because plaintiff's additional documents have

no import in reaching the merits of this case, I will deny both parties' motions as unnecessary.

ORDER

IT IS ORDERED that

1. Plaintiff Jacqueline Hejsak's motion for summary judgment against defendant Great–West Life and Annuity Insurance Company is GRANTED as to her breach of contract claim; defendant's motion as to that claim is DENIED;

2. Plaintiff's motion for summary judgment on her bad faith claim against defendant is DENIED; defendant's motion as to that claim is GRANTED.

3. Defendant is ordered to pay plaintiff $150,000 plus interest as required under life insurance policy # 87520645;

4. Plaintiff's motion to supplement the affidavits of Neal Taylor, M.D. and Marshall Reavis and defendant's motion for leave to reply to plaintiff's additions to the record are DENIED as unnecessary.

5. The clerk of court is directed to close this case.